Constance MOORE

v.

**CANAL NATIONAL BANK.**

Supreme Judicial Court of Maine.

Dec. 31, 1979.

---

Sewall & Mittel by Robert Edmond Mittel (orally), Portland, for plaintiff.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster by Gloria A. Pinza (orally), Gerald M. Amero, Samuel H. Merrill, Assistant Legal Officer, Kelly, Remmel & Zimmerman, U. Charles Remmel, II, Portland, for defendant.

Before POMEROY, ARCHIBALD, GODFREY and NICHOLS, JJ.

GODFREY, Justice.

Appellant Constance Moore filed a class action against respondent Canal National Bank, alleging violations of the Federal Truth in Lending Act, 15 U.S.C.A. ch. 41, subch. I (§§ 1601 to 1667e) and of the Maine Consumer Credit Code, 9–A M.R.S.A. (Supp. 1979–80), hereinafter referred to as "the Code."[1] The complaint requested statutory penalties, damages and attorneys' fees. The Superior Court denied plaintiff's motion for class certification and granted defendant's motion for judgment on the pleadings, treating the motion as one for summary judgment under Rule 12(c), M.R. Civ.P. We sustain the plaintiff's appeal.

From a stipulation filed by the parties the following facts appear: In June of 1976, while she was an employee of Canal, appellant Moore purchased a 1971 Pontiac, financing the transaction by obtaining from Canal a consumer loan[2] secured by the Pontiac, in the base amount of $1,700. Appellant's "secured note and disclosure" to Canal provided for a finance charge[3] of $140.56 and for repayment of the total "precomputed" loan[4] of $1840.56 in 24 successive monthly installments of $76.69 each, beginning July 31, 1976. The secured note stated the annual rate of the finance charge as 7.5 per cent. That rate was a preferred rate granted by Canal to its own employees in similar lending transactions with them.[5] The "secured note and disclosure" nowhere referred to any requirement that appellant refinance the loan at a higher rate if her employment with Canal should cease.

In connection with the loan, appellant executed four documents:

(1) The "secured note and disclosure" described above, dated June 18, 1976.

(2) A security agreement, dated June 18, 1976, meeting the requirements of the Uniform Commercial Code.

(3) A "preferred-rate agreement," dated June 18, 1976.

(4) An "employee loan form," dated June 24, 1976.

The "preferred-rate agreement" provided as follows:

"Undersigned, (hereinafter called 'Employee'), an employee of the Canal National Bank (hereinafter called 'Canal') hereby acknowledges that the rate of FINANCE CHARGE on the loan made by Canal to Employee and evidenced by a Note of even date herewith is a Preferred Rate made available to Employee in consideration of Employee's being in the employment of the Canal.

---

1. The Federal Reserve Board's exemption of certain Maine transactions from the requirements of 15 U.S.C. ch. 41, subch. I, pt. B, has an exception for transactions in which a federally chartered institution is the creditor. Supp. III to Reg. Z, para. (b) (1970). The loan in question, having been made by a national bank, was not exempt from federal regulation.

2. Defined in 9–A M.R.S.A. § 1.301(14) & (23). "Consumer" is also defined in 15 U.S.C. § 1602(h).

3. Defined in 9–A M.R.S.A. § 1.301(19) and in 15 U.S.C. § 1605.

4. Defined in 9–A M.R.S.A. § 1.301(31) (Supp. 1979–80).

5. Canal has since discontinued its practice of according preferential rates to its employees in such transactions.

"Employee understands and agrees that in the event that Employee shall cease to be employed by the Canal National Bank, Employee shall pay to Canal all accrued interest to the date of cessation of employment and the unpaid balance as of such date shall be refinanced over the remaining term of the obligation at a rate of FINANCE CHARGE equal to that being offered generally to members of the public for loans of similar type and risk, and Employee agrees to execute all documents reasonably deemed necessary by Canal to implement such refinancing."

The "employee loan form," by which appellant authorized certain deductions from her pay to meet installments of the loan, contained, among other things, the following sentence:

"If I terminate my employment before the loan is paid out, I agree to sign a new note rewritten at current rate."

On December 2, 1976, appellant's employment was terminated for repeated overdrawing of her savings account with Canal, later held by the Maine Employment Security Commission to be "misconduct connected with her work." On December 17, 1976, appellant executed a new "secured note and disclosure" which correctly disclosed the annual rate of the new finance charge as 12 per cent, the rate then generally available to non-employees for similar loans. Also on December 17, 1976, appellant executed a new security agreement with Canal covering the Pontiac as collateral.

### I. Truth in Lending Act

Appellant does not contend that Canal failed to make any of the disclosures required by the Federal Truth in Lending Act. She contends, rather, that the bank violated the act by failing to make all disclosures in the same document.

The Board of Governors of the Federal Reserve System may prescribe regulations to carry out the purposes of the Truth in Lending Act. 15 U.S.C. § 1604. Those regulations may contain, among other things, such provisions as the Board deems necessary to prevent circumvention or evasion of the purposes of the act. Pursuant to that power, the Board promulgated the provisions of part 226 of title 12 of the Code of Federal Regulations, which provisions are known collectively as "Regulation Z." Until October 10, 1977, no provision of either the act or Regulation Z set forth explicitly the legal consequences of a provision in a loan agreement making the annual percentage rate subject to increase.[6] However, when the loan here in question was made, Official Board Interpretation § 226.-810 of Regulation Z had been in effect for several years, stating as follows:

"§ 226.810 Disclosures—variable interest rates.

(a) In some cases a note, contract, or other instrument evidencing an obligation provides for prospective changes in the annual percentage rate or otherwise provides for prospective variation in the rate. The question arises as to what disclosures must be made under these circumstances when it is not known at the time of consummation of the transaction whether such change will occur or the date or amount of change.

(b) In such cases, the creditor shall make all disclosures on the basis of the rate in effect at the time of consummation of the transaction and shall also disclose the variable feature.

(c) If disclosure is made prior to the consummation of the transaction that the annual percentage rate is prospectively subject to change, the conditions under which such rate may be changed, and, if applicable, the maximum and minimum limits of such rate stipulated in the note, contract, or other instrument evidencing the obligation, such subsequent change in the annual percentage rate in accordance with the foregoing disclosures is a subse-

---

6. If the annual percentage rate is subject to increase, a 1977 amendment to 12 C.F.R. § 226.8(b)(8) clearly requires advance disclo-sure of that fact. That amendment, effective October 10, 1977, is not applicable in this case.

quent occurrence under § 226.6(g) and is not a new transaction." [7]

Appellant's position is that under section 226.810(b), Canal was required to disclose the fact of a possible increase in the annual percentage rate of its loan to her. The bank did disclose that fact in its "preferred rate agreement" with appellant but not in the (separate) "secured note and disclosure."

Regulation Z has always required that all disclosures be made on a single document. At the time of the loan, 12 C.F.R. § 226.8(a) provided, in pertinent part, as follows:

"All of the disclosures shall be made together on either

(1) The note or other instrument evidencing the obligation on the same side of the page and above or adjacent to the place for the customer's signature; or

(2) One side of a separate statement which identifies the transaction."

■ It is not a defense that the debtor suffers no actual damage from a violation of that regulation. As one federal court concluded, referring to this requirement:

"The violation we have noted is admittedly technical and, if free to do so, the Court would be inclined as a matter of equity to view plaintiff's actual knowledge of GMAC's role in this matter as sufficient to shield defendant from liability. However, many of the requirements of the Truth-in-Lending Act are technical in nature, and the Court is not at liberty to deviate from them as it sees fit. Regulation Z unequivocally requires that necessary disclosures shall be written and made together on one document. The drafters of the legislation obviously felt that oral statements by creditors or piecemeal disclosures are not adequate to ensure the consumer's protection. Regardless of the wisdom or validity of that proposition, it is not this Court's prerogative to substitute its own view for that of Congress." *Lauletta v. Valley Buick,*

*Inc.,* 421 F.Supp. 1036, 1040 (W.D.Pa. 1976)

*Accord, Gennuso v. Commercial Bank & Trust Co.,* 566 F.2d 437, 443 (3d Cir. 1977).

■ The Bank contends that it was not required to disclose the variable rate provision at the time of the original transaction and that all necessary disclosures were thus made on the first note. The Bank's position, though doubtfully supported by language taken from certain Federal Reserve staff opinion letters, is plainly inconsistent with the requirement of Official Board Interpretation § 226.810(b),[8] applicable in June, 1976, that "the creditor . . . shall also disclose the variable feature." The Federal Reserve Board's interpretations of its own regulations are entitled to great weight.

"Great deference is especially due the Federal Reserve Board's construction of its own Regulation Z because of the important interpretive and enforcement powers granted this agency by Congress under the Truth in Lending Act." *Bone v. Hibernia Bank,* 493 F.2d 135, 139 (9th Cir. 1974).

Moreover, to hold that the Bank had no obligation to disclose that the interest rate was subject to increase would be contrary to a basic policy of the Truth in Lending Act and Regulation Z: disclosure, in one easily accessible place, of all the important terms of a loan. *See Herbst v. First Fed. Sav. & Loan Ass'n of Madison,* 538 F.2d 1279 (7th Cir. 1976).

■ In its brief, the bank refers to subsection (f) of 15 U.S.C. § 1640, which provides as follows:

"No provision of this section or section 1611 of this title imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Board or in conformity with any interpretation or approval by an official or employee of the Federal Reserve System

---

7. Official Board Interpretation § 226.810 was rescinded on October 10, 1977, when 12 C.F.R. § 226.8(b)(8) became effective. *See* 42 Fed. Reg. 20455 (1977).

8. Quoted in text above, at notecall 7.

duly authorized by the Board to issue such interpretations or approvals under such procedures as the Board may prescribe therefor, notwithstanding that after such act or omission has occurred, such rule, regulation, interpretation, or approval is amended, rescinded, or determined by judicial or other authority to be invalid for any reason."

That section does not apply to the present case. The bank was plainly required by former Official Board Interpretation § 226.-810 to disclose to appellant the variable rate feature of its loan, and it did so. However, it did not place the disclosure with other necessary disclosures as required by section 226.8(a) of Regulation Z. None of the Federal Reserve staff opinion letters cited by the bank contains any suggestion that that provision is subject to an exception with respect to disclosure of the variable rate feature of a variable rate loan.

In order to comply with the applicable provisions of the Federal Truth in Lending Act and Regulation Z, as formally interpreted by the Federal Reserve Board years before the time of the loan to appellant, the Bank was required to make all necessary disclosures, including the possibility of increase in the annual percentage rate, in a single document. The documents executed at the time of the original transaction were attached as exhibits to appellant's complaint and are part of the record on appeal. All disclosures were not made together in the same instrument or statement as required by 12 C.F.R. § 226.8(a). The Bank was in violation of Regulation Z and hence of the Truth in Lending Act, and summary judgment should have been entered in favor of the plaintiff on her first claim for relief. Since the violation occurred in June, 1976, damages must be assessed pursuant to 15 U.S.C. § 1640(a), as amended by Pub.L. No. 93–495, 88 Stat. 1500, § 408(a) (1974).

II. *Maine Consumer Credit Code*

Appellant Moore asserts that the bank's transaction with her in December, 1976, at 12 per cent was a "refinancing" of her 7.5 per cent June loan with an increase in the rate of finance charge exceeding ¼ per cent

per year in violation of section 2.504 of the Maine Consumer Credit Code. That section provides, in pertinent part, as follows:

"Subject to section 2.308 [not applicable here], with respect to a consumer credit transaction, the creditor may by agreement with the consumer, refinance the unpaid balance and may contract for and receive a finance charge based on the amount financed resulting from the refinancing at a rate not exceeding by ¼% per year the rate charged in the original agreement and stated to the consumer pursuant to the provisions on disclosure.

. . . For the purpose of determining the finance charge permitted, the amount financed resulting from the refinancing comprises the following:

1. If the transaction was not precomputed, the total of the unpaid balance and the accrued charges on the date of the refinancing, or, if the transaction was precomputed, the amount which the consumer would have been required to pay upon prepayment pursuant to the provisions on rebate upon prepayment, section 2.510, on the date of refinancing, except that for the purpose of computing this amount no minimum charge shall be allowed; and

2. Appropriate additional charges, section 2.501, payment of which is deferred." 9–A M.R.S.A. § 2.504 (Supp.1979–80).

Canal Bank argues that it did not refinance appellant's loan within the meaning of section 2.504 but implemented the variable rate feature of the loan in the amount and manner agreed on in the original transaction in June. It contends that the words "refinance" and "refinancing" are used in section 2.504 in a special technical sense to denote a transaction the terms of which are not fully controlled by those of the original loan agreement; in other words, that they denote a transaction requiring some element of new bargaining between the parties. Even though the bank's own "Preferred Rate Agreement (Employees Only)," which appellant executed in June required in terms that the employee-borrower "refinance" the unpaid balance of the loan on

leaving the bank's employment and referred to the contingent later transaction as a "refinancing," the Bank says the later transaction did not fall within the scope or purpose of section 2.504. The rate of the new finance charge and the duration of the new loan, the Bank observes, were both objectively ascertainable from the provisions of the original loan agreement and depended only on the state of the loan and the current percentage rate at such time as the employee might leave the employment.

In support of its construction, the Bank says that the purpose of the statutory provision limiting any increase in the rate of finance charge is to remove one incentive for "flipping"; that is, to remove any incentive lenders might have to take advantage of troubled debtors by refusing to refinance their loans unless they agree to a considerable increase in the finance charge, and that this purpose is not served by applying the statute to the implementation of a variable rate loan because the increase in rate has been settled by the original loan agreement. Thus, the Bank seeks an equitable interpretation of section 2.504 to exclude the December transaction entered into precisely in accordance with the provisions of the June loan agreement.

Appellant Moore urges us to hold that the word "refinance," as used in section 2.504, has a "plain meaning" that must obviously include her December transaction. However, the problem cannot be properly resolved by mere resort to the plain meaning rule when the very issue is whether to adopt an equitable construction of the provision. It is necessary to analyze the language in an effort to determine its purpose in the context of state and federal consumer credit legislation.

As the trial justice observed, there is no definition of "refinance" in the Maine Consumer Credit Code or in the Uniform Consumer Credit Code of other jurisdictions that have enacted it. Dictionary definitions are not helpful in this case. The prohibition in section 2.504 against increasing the rate of finance charge by more than ¼ per cent in the "refinancing" of most types of consumer credit transactions is the result of a nonuniform variation from the language of section 2.504 of the 1974 Uniform Consumer Credit Code, 7 U.L.A. 583, 684 (1974). With respect to most consumer loans, the 1974 uniform version of section 2.504 is substantially the same as that of Maine except that the uniform version would permit "refinancing" at a rate of finance charge not exceeding that permitted by the provisions on finance charges for consumer loans, viz., subsections (1) and (2) of section 2.401. The Comment to section 2.504 of the Uniform Consumer Credit Code contains the following statement:

"In the refinancing of a precomputed transaction the balance owing is treated as though it is prepaid and the consumer is credited with all refunds computed, except that minimum charges permitted under Section 2.510(2) for prepayments of precomputed transactions are not allowed in refinancing in order to remove any incentive the creditor may have to 'flip' the consumer through repeated financings. A finance charge is then calculated on an amount financed which is the balance owing less refunds."

Comparison of the Maine and uniform versions of section 2.504 with respect to their impact on precomputed consumer loans shows that (1) both versions remove any incentive to "flipping" that might otherwise arise either out of imposition of penalty charges on prepayment or out of failure to allow the debtor the refund he is entitled to on prepayment, and (2) the Maine version, but not the uniform version, removes any incentive to the creditor to refinance that might arise from the prospect of increasing beyond ¼ per cent the rate of finance charge. In the case of a precomputed consumer loan, the effect of Maine's nonuniform provision is to diminish the lender's incentive to refinance only in cases where the original rate of finance charge is more than ¼ per cent smaller

than the generally permitted maximum for that type of loan under the act.[9]

The mischief in the kind of flipping that has been remedied by both versions of section 2.504 was that the lender could keep the portion of the finance charge that had not been "earned" by the time of refinancing; that is, by the time the unpaid balance of the first loan was paid out of the proceeds of the second. It was also thought unfair that the debtor should have to pay any prepayment penalty agreed on in the original loan agreement when he did not really terminate the debtor-creditor relationship but continued it, in effect, by the refinancing. H. Kripke, *Consumer Credit* 103 (1970). Thus, in two ways, the unsophisticated debtor could have been required, before enactment of the Code, to pay a higher rate for his refinancing loan than he might have supposed from the lender's mere statement of an "interest rate" for it.

The peculiar Maine variation from the uniform version of section 2.504 is not explainable on quite the same grounds. Before the Code, by "flipping" a consumer loan the creditor could acquire certain "unearned" interest and penalties, relying for his right to do so on language in the original loan agreement which the ordinary consumer-debtor would not have recognized as applicable to a refinancing. The two devices that formerly made the "flipping" of loans lucrative and are now implicitly barred by both the Maine and uniform versions of section 2.504 were effective partly because the debtor was usually unaware of the fact that they were being employed by the lender. "Flipping" was thus open to objection not merely as being unfair but as contravening a policy, now strongly expressed in the Code, in favor of full disclosure.

However, the policy against nondisclosure cannot serve even as a partial explanation for the special prohibition in Maine against increasing by more than ¼ per cent the rate of charge on a refinancing. In the case of refinancing which is negotiated during the life of the original loan and the terms of which are not controlled by the original loan agreement, if the creditor duly observes all the truth-in-lending requirements for disclosure at the time of the new loan, the consumer-debtor who seeks the refinancing is apprised of the new rate of finance charge and may govern his conduct accordingly. In the case of a "refinancing" the terms and conditions of which are fully controlled by the original loan agreement, if the creditor observes all the truth-in-lending requirements for disclosure at the time of the original loan, the consumer-debtor has been duly apprised at least of the fact that a higher rate of finance charge will become applicable. In either case, whatever his problems at the time of "refinancing" may be, they are not the result of nondisclosure of unfavorable terms. It is necessary, therefore, to seek some other purpose behind the special limitation in the Maine version of section 2.504. The prohibition against "refinancing" with more than ¼ per cent increase in the annual percentage rate cannot be explained by reference either to the evils traditionally associated with "flipping," which are dealt with in other provisions of section 2.504, or to the Code policy favoring full disclosure.

Neither the Maine Consumer Credit Code nor the federal Truth in Lending Act prohibits variable rate loans as such.[10] They are certainly not barred by anything in Regulation Z. In 1976, when the loan here in question was made and "refinanced," the Federal Reserve Board's Official Interpretation § 226.810[11] set forth the information which, before October 10, 1977, the creditor had to disclose concerning the variable rate feature of such a loan. That interpretation and later amendments of section 226.8 of

---

9. In general, for a consumer loan other than a supervised loan, the maximum finance charge permitted in Maine is 12¼ per cent per year on the unpaid balance of the amount financed. 9–A M.R.S.A. § 2.401 (Supp.1979–80).

10. Section 3.308, of the Code, prohibiting the scheduling of substantially unequal payments in most kinds of consumer loans, has no application to the present case.

11. Quoted in text above at notecall 7.

Regulation Z make it clear that, for purposes of disclosure, an increase in rate in accordance with the disclosed conditions of a variable rate loan is not a "refinancing" of the original agreement requiring new disclosures. In the present case, Canal Bank fully disclosed the variable rate feature of its June 18 loan even though it violated Regulation Z by disclosing it in a separate document. For purposes of disclosure under the federal act, the December, 1976, transaction was not a "refinancing."

The idea behind the Federal Reserve Board's treatment of variable rate loans for disclosure purposes is that the later transaction is essentially an automatic implementation of the variable rate feature of the original loan and no give-and-take bargaining is involved in the later, "refinancing" transaction. If the terms of the original loan were fully disclosed, the debtor has no reason to be surprised or aggrieved by a virtually automatic increase in rate in accordance with those terms. The "refinancing" that takes place on the occurrence of a contingency triggering a variation in rate involves no element of bargaining between creditor and debtor. In the present case, the amount of the percentage rate on "refinancing" was pegged in the original loan agreement to the "rate offered generally to members of the public for loans of similar type and risk"; appellant Moore does not contend that that provision gave the bank any discretion in setting the amount of the new rate.

■ Section 2.504 is designed to cover primarily the common situation in which a consumer-debtor, unable to meet payments due under a loan, seeks to negotiate a refinancing that will reduce the size of each payment, or lengthen the payment intervals, and extend the period of the loan. In that type of case the object of the Maine version of section 2.504 is clearly to limit to ¼ per cent any increase of the annual percentage rate to prevent undue exploitation by the creditor of the debtor's necessity.

■ In practical effect, to hold that the "refinancing" referred to in section 2.504 includes a transaction of the kind here in question would render variable-rate loans nearly useless as a financing device—a drastic result that could not be justified in the absence of some manifestation of legislative disapproval of variable-rate loans elsewhere in the consumer credit laws and regulations. It makes more sense, especially in view of the underlying purpose of most of section 2.504 to discourage "flipping" to hold that the term "refinance" as used in that section does not include the virtually automatic implementation of a disclosed variable-rate feature of a variable-rate loan. Regulation Z has taken that approach to "refinancing" of variable-rate loans in its rules and interpretations on disclosure. There is some merit in construing section 2.504 of the Maine Code in harmony with existing disclosure rules.

We hold, therefore, that Canal Bank did not "refinance" appellant Moore's loan within the meaning of 9–A M.R.S.A. § 2.504 and was thus not bound by the ¼ per cent limit on increase in the annual percentage rate. The trial court's judgment for defendant Canal Bank on appellant's second claim for relief is affirmed.

■ It must not be assumed that our interpretation of the meaning of "refinance" and "refinancing" in section 2.504 carries any implication that the "flipping" practices that are in effect prohibited by subsection (1) of that section are not prohibited in the case of variable rate loans. Since, for purposes of disclosure and application of section 2.504, a transaction that automatically implements the (disclosed) variable-rate feature of the original variable-rate loan is to be regarded merely as a step in the progress of the original lending arrangement, the creditor may not treat the original loan as prepaid or otherwise terminated at the time of the implementing transaction. In effect, the creditor in such a situation, like the creditor who refinances a single-rate loan, must observe the limitations provided by subsections (1) and (2) of section 2.504. Though the creditor on the variable-rate loan is not "refinancing" the loan, technically speaking, the implement-

ing transaction is to be considered as subject to the same restrictions as apply to the refinancing of a single-rate loan under those subsections.

■ Finally, in the circumstances of this case, the trial justice did not abuse his discretion in denying plaintiff's motion for class certification under Rule 23, M.R.Civ.P.

The entry is:

Appeal sustained.

Judgment for defendant on plaintiff's first claim for relief, under the Federal Truth in Lending Act and Regulation Z, vacated.

Judgment for defendant on plaintiff's second claim for relief, under 9–A M.R.S.A. § 2.504, affirmed.

Order denying class certification, affirmed.

Remanded for further proceedings consistent with this opinion.

McKUSICK, C. J., and WERNICK, J., did not sit.

DELAHANTY, J., sat at argument but did not otherwise participate.