**BAR HARBOR BANKING AND TRUST COMPANY**

v.

**SUPERINTENDENT OF the BUREAU OF CONSUMER PROTECTION.**

Supreme Judicial Court of Maine.

Argued Nov. 15, 1983.
Decided Feb. 10, 1984.

---

Eaton, Peabody, Bradford & Veague, P.A., John E. McKay (orally), Clare Hudson Payne, Bangor, for plaintiff.

James E. Tierney, Atty. Gen., Patricia M. McDonough (orally), Peter B. Bickerman, Asst. Attys. Gen., Augusta, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, GLASSMAN and SCOLNIK, JJ.

NICHOLS, Justice.

The Plaintiff, Bar Harbor Banking and Trust Company, appeals from an order issued by the Superior Court, Hancock Coun-

ty, affirming (with one modification) a decision and order of the Superintendent of the Bureau of Consumer Credit Protection. In that decision and order, dated April 9, 1980, the Superintendent found that the Plaintiff had violated section 2–504 of our Consumer Credit Code[1] with respect to thirty-seven loans. We uphold the Superintendent's interpretation of section 2–504 and, accordingly, we affirm the judgment below.

After conducting an examination of about 320 loans extended by the Plaintiff, the Bureau of Consumer Protection on October 3, 1979, issued a report concluding that the Plaintiff had committed thirty-nine violations of section 2–504 of the Consumer Credit Code. At the time of the examination, this section read in pertinent part:

§ 2–504. Finance charge on refinancing
Subject to Section 2–308 with respect to a consumer credit transaction, the creditor may by agreement with the consumer, refinance the unpaid balance and may contract for and receive a finance charge based on the amount financed resulting from the refinancing at a rate not exceeding by ¼% per year the rate charged in the original agreement and stated to the consumer pursuant to the provisions on disclosure. This section shall not apply to consumer loans in which the principle [sic] thereof is payable in a single payment on demand or at a specific time and the finance charge, calculated according to the actuarial method does not exceed 12¼% per year.[2]

9–A M.R.S.A. § 2–504 (1979), amended by P.L.1979, ch. 660, §§ 7, 8, P.L.1981, ch. 235 § 3. The Plaintiff cured two of the alleged violations, leaving a remainder of thirty-seven alleged violations.

On January 23, 1980, the Superintendent held an administrative hearing pursuant to 9–A M.R.S.A. § 6–108 concerning the Plaintiff's alleged violations. A Bureau examiner testified that the alleged violations all involved single payment notes on which the annual percentage rate was increased from under 12¼% to over 12¼%. The Plaintiff's president urged that these transactions were "renewals," not "refinancings" within the meaning of section 2–504.

In her decision and order the Superintendent concluded that the Plaintiff had violated section 2–504. She ordered it to refund to the customers concerned the difference between the finance charges imposed on them and the maximum finance charges permitted by the statute, plus interest earned on such charges. In addition, the Superintendent ordered the Plaintiff to reform all outstanding consumer loans refinanced in violation of the statute and to cease and desist from increasing the interest rate by more than ¼% for single payment loans when the rate resulting from refinancing exceeds 12¼%.

The Plaintiff sought review of the Superintendent's decision in Superior Court pursuant to M.R.Civ.P. 80B. On May 26, 1983, that court affirmed the decision.

On appeal here the Plaintiff contends that section 2–504 does not apply to the transactions at issue because they were "renewals," while the section speaks only of "refinancing." The distinction, in the Plaintiff's view, is that a refinancing occurs before the maturity date of the initial loan and a renewal occurs on or after such date. The Superintendent, on the other hand, regards a renegotiated loan as a "refinancing" regardless of whether it occurred before or after the maturity date of the initial loan.

The question posed for us is which of these competing interpretations of the term "refinancing" better accomplishes the purposes of the statute. There is no definition of "refinance" in the Code itself.

1. For the Uniform Consumer Credit Code (1974) from which our Code is adapted, see 7 U.L.A. 583 (1978).

2. The first sentence was subsequently amended by substituting "1%" for "¼%." P.L.1981, ch. 235 § 3.

■ We had occasion to interpret section 2–504 in *Moore v. Canal National Bank,* 409 A.2d 679 (Me.1979). That case involved a variable-rate loan, where it was agreed *ab initio* that the loan would be paid off in installments and that the interest rate on these installments would vary. After examining the language and the legislative history of the provision, we concluded that refinancings "denote a transaction requiring some element of new bargaining between the parties." *Id.* at 684. We found the purpose of the section to be the deterrence of "flipping," the practice whereby lenders take advantage of embarrassed debtors by conditioning the renegotiation of a loan repayment on a considerable increase in the finance charge. *Id.* at 685–87. We stated at that time:

> Section 2.504 is designed to cover primarily the common situation in which a consumer-debtor, unable to meet payments due under a loan, seeks to negotiate a refinancing that will reduce the size of each payment, or lengthen the payment intervals, and extend the period of the loan. In that type of case the object of the Maine version of section 2.504 is clearly to limit to ¼ per cent any increase of the annual percentage rate to prevent undue exploitation by the creditor of the debtor's necessity.

*Id.* at 687. This rationale for restricting finance charges applies with equal force to single payment and installment notes and to renegotiation transactions both before and after the loan's maturity date.

■ The Consumer Credit Code is to "be liberally construed and applied to promote its underlying purposes and policies." 9–A M.R.S.A. § 1–102(1). One such purpose, as elucidated in *Moore, supra,* is to prevent "flipping" when a debtor seeks to arrange an alternate scheme for repayment. This purpose would be thwarted if "flipping" were to be permitted in every instance where the alternate arrangement had been made at or after the original maturity date. To avoid that result, we need not strive to "liberally construe" the term "refinancing," however. We simply may choose the ordinary, dictionary meaning[3] over the Plaintiff's novel, unsupported definition.

The Plaintiff cites only two cases to support the definition which it urges: *Liberty National Bank & Trust Co. v. Dvorak,* 199 N.W.2d 414 (N.D.1972) and *Elk Horn Bank & Trust Co. v. Spraggins,* 182 Ark. 27, 30 S.W.2d 858 (1930). These cases are not on point, nor do they make the distinction that the Plaintiff advocates. In fact, they do not interpret "refinancing" at all.[4] Other courts have defined "refinancing" broadly, with no indication that it is limited to transactions prior to the original loan's maturity date. *See, e.g., Bankers Life Co. v. International Telephone & Telegraph Corp.,* 239 F.2d 621, 623 (7th Cir.1956); *American Indemnity Co. v. Allen,* 176 Tenn. 134, 138 S.W.2d 445 (1940).

■ There was testimony at the hearing that the banking industry generally regards "refinancing" and "renewal" to be synonymous. The Plaintiff asserted to the contrary but offered no support. Accordingly, we adopt the Superintendent's interpreta-

3. "Refinance" is defined as "to finance something anew." *Webster's New Collegiate Dictionary* 971 (1973).

4. *Liberty National* concerned the exoneration of a guarantor. The North Dakota court found that the guarantor was exonerated because his obligation was altered, rather than renewed. Since there had been a substantial increase in the principal debt and increased payments, the new obligation could not be characterized as a renewal. (For the same reason, it could not be characterized as a refinancing.) *Elk Horn* dealt with a note secured by a vendor's lien. An Arkansas statute provided that a renewal could not operate to revive the underlying debt for certain purposes. The court found that there had been no renewal (nor did it find any refinancing), but simply regular installment payments. The court defined a renewal as "an agreement upon a valuable consideration for the maturity of the debt on a day subsequent to that provided in the original contract." In order to make sense linguistically, this definition must mean that the *maturity of the debt,* not the agreement, is on the "day subsequent" to that originally provided.

tion of "refinancing" as embracing the transactions involved in this appeal.

The Plaintiff next contends that it is unreasonable and contrary to the legislative intent for the Bureau to interpret section 2–504 to apply to any refinancing in which the *resulting* interest rate, rather than merely the interest rate in the initial transaction, exceeds 12¼%.

Section 2–504 expressly limits its application to loans on which the finance charge exceeds 12¼% per annum, if the loan is secured by a single payment time note. All but three of the Plaintiff's contested loans were so secured, and on all the loans the initial finance charge was less than 12¼%, while the finance charge after refinancing was greater than 12¼%. The Plaintiff interprets the "12¼%" limitation as applying to the initial loan.

■ As the Superintendent observed in her decision and order, "[t]he Bureau has a long-standing history of interpreting the [12¼%] exception . . . to apply to the resulting refinanced loan and *not* the original loan being refinanced." The construction of a statute by an agency charged with enforcing it is entitled to great deference. *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *Kelley v. Halperin,* 390 A.2d 1078, 1080 (Me.1978). We shall accept the agency's construction, especially if, as here, it is long established or contemporaneous with the statute, unless it clearly violates the legislative intent. *See Central Maine Power Co. v. Public Utilities Commission,* 436 A.2d 880, 885 (Me.1981).

■ It is not clear from the language of the statute whether the "finance charge" referred to means only the initial charge or any subsequent finance charge as well. Nor is the available legislative history helpful in deciphering the Legislature's intent with respect to this provision.

Accordingly, we conclude that this is a matter in which deference to the expertise of the Bureau is appropriate.

The entry must be:

Appeal denied.

Judgment affirmed.

All concurring.