690 A.2d 535

**SPRINGHILL LAKE INVESTORS LIMITED PARTNERSHIP**

v.

**PRINCE GEORGE'S COUNTY, Maryland.**

**No. 923, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

March 5, 1997.

Richard A. Medway (Elliott B. Adler and Powell, Goldstein, Frazer & Murphy, on the brief), Washington, D.C., for appellant.

J. Michael Dougherty, Jr., Associate County Attorney (Barbara L. Holtz, Acting County Attorney, on the brief), Upper Marlboro, for appellee.

Argued before MOYLAN, CATHELL and HOLLANDER, JJ.

CATHELL, Judge.

Section 10–188(d) of the Prince George's County Code, in pertinent part, contains an exemption from county transfer taxes. It provides: "Upon any refinancing of property by the original mortgagor or mortgagors, the [transfer] tax shall apply only to the consideration over and above the amount of the original mortgage or deed of trust." The lone issue presented by the case *sub judice* is whether the indemnity deed of trust that appellant recorded among the land records for Prince George's County evidenced a refinancing and therefore qualified for the refinancing exemption.

Springhill Lake Investors Limited Partnership, appellant, challenges the denial of its application for the refund of transfer taxes paid (under protest) to Prince George's County (the "County"), appellee, upon the recordation of an Amended and Restated Indemnity Deed of Trust and Security Agreement in the principal amount of $58,000,000 that was part of a total of a $63,000,000 refinancing. That denial was upheld by both the Maryland Tax Court and the Circuit Court for Prince George's County. We shall begin our discussion by setting forth the transactions at issue and the relevant procedural background.

### The Transactions

In January of 1985, appellant borrowed $58,000,000 from the Connecticut General Life Insurance Company (CIGNA). In return, appellant gave CIGNA a promissory note in that same amount, and, in addition to another guaranty instrument, an indemnity deed of trust was executed and delivered to CIGNA by: First Springhill Lake Limited Partnership, Second Springhill Lake Limited Partnership, Third Springhill Lake Limited Partnership, Fourth Springhill Lake Limited Partnership, Fifth Springhill Lake Limited Partnership, Sixth Springhill Lake Limited Partnership, Seventh Springhill Lake Limited Partnership, Eighth Springhill Lake Limited Partnership, Ninth Springhill Lake Limited Partnership, Springhill Commercial Limited Partnership, and Springfield Facilities, Inc. (collectively, the Indemnitors). Pursuant to this trust deed, the Indemnitors conveyed certain real property to trustees for the benefit of CIGNA, because CIGNA "would not have made [the] Loan without the giving of this Deed of Trust." This indemnity deed of trust was recorded among the land records for Prince George's County; for reasons unknown, no transfer taxes were imposed or collected upon the recordation of that document.[1]

Subsequently, in April of 1993, as a part of a refinancing by appellant, the borrower, CIGNA assigned all of its right, title, and interest in the note and indemnity deed of trust to trustees for Aldrich, Eastman & Waltch (AEW), a trust entity. Concurrently, appellant entered into a new loan agreement with AEW; it stated:

Borrower [appellant] wishes to refinance the CIGNA Loan with a loan from Lender [AEW] in the original principal amount of $63,000,000.

Lender and Borrower have agreed that Lender will purchase the CIGNA Loan for the sum of $58,000,000, that the

---

1. Both parties have stipulated that "[a]t the time the Original Deed of Trust was recorded, the Director of Finance had the authority to collect a transfer tax on the principal amount secured by the Original Deed of Trust."

CIGNA Note and CIGNA Deed of Trust will be amended and restated in their entirety, and that Lender will lend an additional $5,000,000 to Borrower, all on the terms and conditions set forth in this Agreement.[2]

In exchange, as security for this new loan, in addition to another guaranty instrument, the same Indemnitors under the original indemnity deed of trust executed and delivered for the benefit of AEW an Amended and Restated Indemnity Deed of Trust and Security Agreement (the "IDOT") in the amount of $58,000,000, which was "to amend, totally restate and supersede in its entirety that certain Indemnity Deed of Trust and Security Agreement granted by [the Indemnitors] to [CIGNA]." Upon the recordation of the IDOT, the County imposed and collected transfer taxes at the rate of one and one-half percent (1–1/2%) or $870,000. We shall further discuss the transaction *infra*.

## Procedural Posture

On July 29, 1993, appellant filed an Application for Refund of Tax Erroneously Paid to Prince George's County, Maryland. By letter dated January 24, 1994, the County denied appellant's application. This determination was appealed, in turn, to the Maryland Tax Court. Before the Tax Court, appellant principally made two arguments: 1) the IDOT was part of a refinance of the property and, therefore, qualified for the refinance exemption contained in section 10–188(d) of the Prince George's County Code; and 2) the County was "merely attempting to obfuscate the nature of the 1993 transaction so that it may now recover the taxes associated with the" first

---

2. As mentioned, in addition to the $58,000,000 necessary to "purchase" the note from CIGNA, AEW also lent appellant (the identical borrower for the original transaction) an additional $5,000,000. Part of this sum was needed to pay off a sum then due on the original deed of trust above its original principal sum of $58,000,000. For the benefit of AEW, the identical Indemnitors executed a Second Indemnity Deed of Trust in the amount of $5,000,000 to secure this additional amount. This document was also recorded among the land records for Prince George's County. At that time, the County collected transfer taxes thereon; appellant does not challenge the collection of those taxes.

indemnity deed of trust that was filed in 1985 and upon which no transfer taxes were imposed.

The Tax Court affirmed the County's decision. In its Memorandum of Grounds for Decision, the Tax Court stated, in relevant part:

The 199[3] IDOT was not a refinance.[3] The language in the IDOT indicates that it was a mere guaranty requiring the grantors [the Indemnitors] to reimburse the lender [AEW], if, and when, the borrower [appellant], defaults on its loan. The only exchange of funds occurred by the sale of the loan from one mortgagee [CIGNA] to another [AEW]. No new debt was incurred on the part of the [Indemnitors]. The indemnity deed of trust secured a guaranty. No debt exists under the instrument to refinance, therefore the exemption from tax does not apply.

. . . .

Petitioner [appellant] also asserts a statute of limitation[s] defense claiming that the County was seeking to impose the tax on the 1985 IDOT beyond the 7[–]year statutory period allowed. This argument is without merit in that the imposition of the tax was triggered by the recordation of the 1993 IDOT, not the 1985 instrument, and the tax was calculated on the consideration as stated therein.

Thereafter, appellant filed a Petition of Appeal for Judicial Review in the Circuit Court for Prince George's County. Before the circuit court, appellant pressed only the refinance exemption argument. In its Memorandum, Opinion and Order of Court, the trial court opined:

This member of the Bench agrees with Prince George's County that no debt existed under the original [1985] or Amended [1993] IDOT at the moment of recordation. An Indemnity Deed of Trust is collateral security in the nature of a guarantee and unless there has been a default, there is

---

3. We note that the language of the 1993 IDOT, although not taken verbatim from the 1985 IDOT, was in most relevant respects identical to the 1985 IDOT, which all parties agree was a financing document for which the transfer tax was due, although never collected.

no debt which can be "refinanced." There being no debt to refinance, the exemption for refinance found in § 10–188(d) of the Prince George's County Code is inapplicable.

Accordingly, the court affirmed the Tax Court's decision. Therefrom, appellant noted a timely appeal to this Court.

## Discussion

■ We first note that, because the issue in this case is whether an instrument qualifies for exemption from taxation, we are called upon to decide an issue of law. Despite its name, the Maryland Tax Court is an administrative agency, and, when reviewing the legal determinations of an administrative agency, a court is under no constraints in reversing a determination that is premised solely upon an erroneous conclusion of law. *Montgomery County v. Buckman,* 333 Md. 516, 519–20, 636 A.2d 448 (1994); *Ramsay, Scarlett & Co. v. Comptroller of Treasury,* 302 Md. 825, 834, 490 A.2d 1296 (1985).

We next note that what is not in question in the case at bar is whether transfer taxes may be collected upon the recordation of an indemnity deed of trust. That question was answered by the Court of Appeals in *Prince George's County v. Brown,* 334 Md. 650, 640 A.2d 1142 (1994). *Brown* makes clear that "the Prince George's County Code provides no exemption [from transfer taxes] for indemnity deeds of trust or other guarantee instruments." *Id.* at 666, 640 A.2d 1142. Our analysis does not end here, however.

In *Brown,* a landowner sought a refund of both State recordation and county transfer taxes collected upon the recordation of three deeds of trust, one of which was an indemnity deed of trust. The landowner argued that a refund was due because the trust deeds were supplemental instruments— *i.e.,* they supplemented previously recorded instruments. Discussing whether a refund of county transfer taxes was due, Judge Karwacki, writing for the Court, held that "[n]o provision [of the Prince George's County Code] explicitly or implicitly exempts supplemental instruments of writing from the

transfer tax." *Id.* at 665, 640 A.2d 1142. The Court then held that "collection of county transfer tax on the . . . Indemnity Deed of Trust was proper." *Id.* at 666, 640 A.2d 1142. Had the county code provided an exemption for supplemental instruments, however, the Court would have, perforce, analyzed whether the indemnity deed of trust qualified under that exemption. *See id.* at 658–62, 640 A.2d 1142 (analyzing whether the three deeds of trust came within the supplemental instrument exemption for State recordation taxes).

Thus, *Brown* contemplates a two-step analysis. The first step is to determine whether transfer tax is even due upon the recordation of the instrument and, clearly, the *Brown* Court held that transfer taxes are due when an indemnity deed of trust is recorded. What was not before the Court of Appeals in *Brown* was the second step of the analysis: if county transfer taxes can be collected upon the recordation of the instrument, does a respective instrument nevertheless qualify for an exemption under other provisions of the statute.

In *Brown*, as to the indemnity deed of trust, because the county code did not contain an exemption for supplemental instruments, the Court ended its discussion after completing the first step; it being clear that transfer taxes are due upon the recordation of an indemnity deed of trust, the case *sub judice* requires that we consider the second step—*i.e.*, does the IDOT qualify for the refinance exemption.

 Under the Tax Court's and circuit court's logic, the debt secured by an indemnity deed of trust can never be refinanced until there is an event of default. Both opined, essentially, that, until there is an event of default, there is no debt under an indemnity deed of trust, a guaranty instrument, and, therefore, because no default had occurred, there was no debt to be refinanced. Thus, for purposes of determining whether the refinance exemption applied, both the Tax Court and the circuit court relied upon the essential difference between a deed of trust and an indemnity deed of trust. We hold, however, that both a deed of trust and an indemnity deed of trust can qualify under the refinance exemption so

long as the instrument is executed and recorded as part of a refinancing transaction. We explain.

 A deed of trust is a security device. It transfers legal title from a property owner to one or more trustees to be held for the benefit of a beneficiary. In the prototypical case involving realty, an owner/borrower approaches a lender seeking funds to purchase or refinance an interest in real property; the lender agrees to make a loan so long as the borrower executes both a note, a promise to repay, and a deed of trust granting legal title to the real property to one or more trustees for the benefit of the lender in case repayment is not made. In other words, the deed of trust secures repayment of the loan. If the loan is not repaid, it is through the deed of trust that the beneficiary has recourse against the property— *e.g.*, by selling the borrower's property and applying the funds received against the borrower's indebtedness.[4] An indemnity deed of trust is but one type or class of a deed of trust. It is also a security device. The principal difference, however, is that, under an indemnity deed of trust, some third party has agreed to act as the guarantor of the borrower by placing its property in trust for the benefit of the beneficiary, thereby agreeing to bear the loss should the borrower default. Stated otherwise, upon an event of default in the underlying obligation, the entire loss may be shifted to the third party. Once again, if the loan is not repaid, it is through the indemnity deed of trust that the beneficiary has recourse—*e.g.*, by selling the third party's property and applying the funds received against the borrower's indebtedness. There is, thus, no net difference in the transactions—money is still lent and property is still given as security—other than that an additional party ultimately bears the risk of loss.

---

4. The prototypical case of an assignment of such indebtedness that would not generally be a refinancing would be where, without any participation by the borrower and without any prior knowledge on his part, one financial entity buys his debt paper from another for the sole interests of the two creditor entities and the debtor is notified, after the fact, to send his payments to the new entity.

Both scenarios contemplate a financing arrangement whereby a note or other bill obligatory is executed to evidence the indebtedness and a deed of trust is also executed as security for that underlying obligation. When property is refinanced, generally speaking, the borrower obtains funds from a second lender to repay the obligation owed to the first, and security, in the form of a new or substitute deed of trust, is given to the second lender to secure the advancement of those funds. For our purposes, it matters not, whether the grantor of the deed of trust is the borrower himself or whether some third party has agreed to guarantee the debt of another. What you have is the replacement or satisfaction of one debt that is secured by real property with funds obtained from a second lender that is also secured by the same parties and the same real property.[5] That is precisely what happened in the case *sub judice*.

In 1985, appellant borrowed $58,000,000 from CIGNA. Appellant promised to repay that obligation, as evidenced by the note, and, as security, the Indemnitors executed for the benefit of CIGNA an indemnity deed of trust. All parties agree that transfer tax was due on this transaction. Some eight years later, in 1993, the indebtedness owed to CIGNA was refinanced with proceeds obtained from AEW. AEW advanced funds sufficient to extinguish the obligation owed to CIGNA, and, as we shall indicate later, it was extinguished, although the record is unclear as to whether the indemnity deed of trust in favor of CIGNA was released, but, in any event, a new or replacement note and IDOT were executed by appellant (the identical borrower) and the Indemnitors (the identical parties), respectively.

Our decision is buttressed by *Prince George's County v. McMahon,* 59 Md.App. 682, 477 A.2d 1218, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984), an example of an alternative refinancing arrangement. In that case, a group of investors,

---

**5.** It is certainly possible that different indemnitors and different indemnity property can be involved in a refinancing. Here, they were the same.

including McMahon, purchased an apartment complex for $1,580,000 in 1973. To finance the transaction, the purchasers assumed an existing deed of trust on the property in the amount of $932,588, and the seller took back a deferred purchase trust in the amount of $347,411.

In 1974, the purchasers paid off the seller's deferred purchase trust and placed a new second trust on the property in the amount of $400,000. When this $400,000 loan was coming due, the purchasers

negotiated an agreement with Waldorf Federal Savings & Loan whereby the [purchasers] borrowed $1,318,550.00 evidenced by a promissory note and a wraparound deed of trust. Of the $1,318,550.00 borrowed, $875,773.00 was placed in escrow, $400,000.00 was used to pay off the 1974 trust, and the [purchasers] retained $42,777.00 in cash.

*Id.* at 684, 477 A.2d 1218. Upon the recordation of the wraparound deed of trust, it was uncontested that the $400,-000 that was borrowed from Waldorf Federal Savings & Loan and used to pay off the 1974 second trust qualified under Prince George's County's refinance exemption—"the paying off of the $400,000.00 debt by a new mortgage qualified as a form of refinancing." *Id.* at 692, 477 A.2d 1218.

Thereafter, the purchasers also sought a refund of the transfer taxes that had been paid on the $875,773 that had been placed in escrow to satisfy the then current balance on the $932,588 deed of trust that the purchasers had assumed when they purchased the property. The County argued that no refund was due under the refinancing exemption because the funds were placed into escrow rather than being used to satisfy the deed of trust at the time of settlement. We disagreed with the County and held that "the original deed of trust of $875,773.00 was refinanced by the wraparound deed of trust even though it was not thereby extinguished." *Id.* at 692, 477 A.2d 1218; *see also generally G.E. Capital Mortgage Servs. v. Levenson,* 338 Md. 227, 246–47, 657 A.2d 1170 (1995) (refinancing lender could retain first mortgagee's priority by equitable subrogation); *Liberty Nursing Ctr. v. Department*

*of Health & Mental Hygiene,* 330 Md. 433, 456, 624 A.2d 941 (1993) (" 'refinancing' logically refers to the substitution of new debt for preexisting debt"); *Brown v. Prince George's County,* 114 Md.App. 242, 689 A.2d 1245 (1997) (transfer tax collected upon recordation of instrument must be refunded upon subsequent failure of lender to advance the consideration stated in instrument).

### Refinancing

As previously stated, section 10–188(d) of the Prince George's County Code provides:

> Upon any refinancing of property by the original mortgagor or mortgagors, the tax shall apply only to the consideration over and above the amount of the original mortgage or deed of trust.

The Prince George's County Code does not, so far as we have been informed or able to ascertain, define the term "refinance." Accordingly, we look elsewhere for a definition.

■ 17 Am.Jur.2d *Consumer & Borrower Protection* § 109 (1990) (footnote omitted) states that "[a] refinancing occurs when an existing obligation ... is satisfied and replaced by a new obligation undertaken by the same consumer." Obviously, the transaction at issue in the case *sub judice* is that type of transaction. Maryland Code (1985, 1994 Repl.Vol., 1996 Supp.), § 12–108(g)(2) of the Tax–Property Article, in regard to the State recordation tax exemptions applicable to principal residences, provides that a "deed of trust is not subject to recordation tax to the extent that it secures *the refinancing of an amount not greater than the unpaid principal amount* secured by an existing ... deed of trust at the time of refinancing." (Emphasis added.) The facts of the case at bar would meet that definitive provision of that statute. This exemption relates not to the nature of the document, but to the nature of the transaction secured by the respective documents. Similarly, Maryland Coa. (1975, 1990 Repl.Vol.), § 12–103(b)(2) of the Commercial Law Article provides, in relevant part, that the term "refinancing" "means increasing or altering ... the term ... or paying off an existing loan."

The present transaction would also be within that definition regardless of its documentation.

In reading case law, we occasionally see terms that flutter throughout the cases without ever being directly defined. The terms refinancing and refinance are apparently two such terms.

In one recent case, *G.E. Capital Mortgage Servs. v. Levenson, supra,* involving equitable subrogation rights in a foreclosure by a refinancing lender, the Court indirectly defined the term in its discussion of subrogation. The Court discussed the subrogation by referencing G.E. Osborne, *Handbook on the Law of Mortgages* § 282 (2d ed. 1970). It stated:

[O]ne context [of subrogation] involves the refinancing of a mortgage. Osborne states:

*"Where a lender has advanced money for the purpose of discharging a prior encumbrance in reliance upon obtaining security equivalent to the discharged lien, and his money is so used,* the ... rule is ... he will be subrogated...."

338 Md. at 231–32, 657 A.2d 1170 (emphasis added). That language we have emphasized is, in essence, what a refinancing transaction is, regardless of the nature of the security and its documentation. The Court in *G.E. Capital* immediately thereafter stated: "In the action before us a mortgage lender refinanced a first mortgage, unaware that judgment liens had arisen ... before the first mortgage was released and the new mortgage placed on the property." *Id.* at 232, 657 A.2d 1170. We conclude, accordingly, that, at least as to that case, the Court considered that the advance of money to pay off a preexisting debt in reliance upon obtaining the same security that secured that debt was a refinancing.

The term "refinancing" was also used, without direct definition, in *Attorney Grievance Comm'n v. Clements,* 319 Md. 289, 290, 572 A.2d 174 (1990): "In the refinancing of a mortgage ... Clements ... did not ... disclose ... prior assignment of rents ... which would not be released...." The facts, however, disclose the transaction to which the refinancing refer-

ence related. In 1980, the property at issue was encumbered by a first deed of trust with Baltimore Life as the beneficiary. There was also a second deed of trust with Union Trust. Clements, and others, purchased the property, assuming the existing deeds of trust, with the sellers taking back a third deed of trust. Subsequently, Baltimore Life threatened foreclosure. Ultimately, John Hanson Savings and Loan, Inc., approved a loan. That loan was subsequently funded and used to pay off some, but not all, of the prior obligation. It was this transaction that was described merely as a "refinancing." *See also Liberty Nursing Ctr. v. Department of Health & Mental Hygiene, supra,* 330 Md. 433, 624 A.2d 941; *Kronovet v. Lipchin,* 288 Md. 30, 33, 415 A.2d 1096 (1980) (consolidated deeds of trusts being rolled over to permanent financing as a refinancing); *Sachse v. Walger,* 265 Md. 515, 518, 290 A.2d 785 (1972) (a domestic case in which refinancing was described as "refinanced his collateral loan by borrowing $89,000.00 from The Equitable Trust Company, and paying $89,900.00,[6] the balance of his Union Trust Company loan").

As can be seen, the Maryland cases assume, for the most part, that the term is generally understood. Those cases that go further merely indicate that it is the nature of the transaction that is being described, not the nature of the document that secures the transaction.

We have sought a more specific definition in cases from other jurisdictions. In that search, we have come to realize that there are but few cases that have involved a definition of the term "refinance."

*CB Commercial Real Estate Group v. Equity Partnerships Corp.,* 917 S.W.2d 641 (Mo.Ct.App.1996), involved an issue of whether a refinancing had occurred to which C.B. Commercial (Coldwell Banker) was entitled to a commission under an unusual (in our experience) provision in its broker's agreement designed to prohibit a seller from avoiding a sale of property (for which a commission would be due) by taking the prospec-

---

6. He apparently obtained $900 elsewhere.

tive buyer in as a partner, with the prospective buyer's entry into the project paid for by a refinancing of the selling entity's debt. As relevant to the case at bar, the court opined:

Both sides offer definitions of refinancing from Black's Law Dictionary 980 (Abridged 6th Ed. 1991): "to finance again or anew; to pay off existing debts with funds secured from new debt; to extend the maturity date and/or increase the amount of an existing debt; to arrange for a new payment schedule." See also, Webster's Ninth New Collegiate Dictionary, 989 (1991) in which the term is defined "to renew or reorganize the financing of; to finance something anew." "Restructure" is defined "to change the makeup, organization, or pattern of." Webster's New Collegiate Dictionary, 980 (1981).

Of the numerous definitions of "refinance" offered, Coldwell Banker maintains that the application of any one of them would serve to prompt a sales commission. Coldwell Banker argues that the definition "to extend the maturity date" constitutes a refinancing. While "refinance" may be susceptible to various definitions, it should be interpreted in the context of the subject matter of the contract in which it is employed and given its plain meaning. Seeming contradictions must be harmonized away if reasonably possible, *State Mut. Life Assurance Co. v. Dischinger,* 263 S.W.2d 394, 401 (Mo.1953), and the court's interpretation should not reach an absurd or unreasonable result. . . .

The exact meaning of "refinance" must depend largely on the kind and character of the contract, its purpose and circumstances, and the context in which it is used. *See Van Deusen v. Ruth,* 343 Mo. 1096, 125 S.W.2d 1, 4 (1938).

917 S.W.2d at 646–47. This is a statement describing the transactional analysis we accept and adopt in the case at bar.

The Louisiana Court of Appeals similarly discussed the term "refinance" in *Collector of Revenue v. Mossler Acceptance Co.,* 139 So.2d 263 (La.Ct.App.1962). The case involved a Louisiana regulation regarding the collection of franchise taxes on "borrowed money" when the taxpayer was a company

that financed automobile purchases and dealt in ninety-day loans of multimillion dollar amounts involving over fifty banks. The banks would lend millions of dollars of short-term money and, after payment was made, require a period of time before that particular bank would again lend money to the entity. Thus, the periods in which a respective bank would not lend money to the company required the company, if it needed interim funding for its operation, to seek financing from another bank. "Borrowed capital," which was taxable under the statute, was defined as "all indebtedness ... maturing more than one year ... or which is not paid within one year.... As to any indebtedness ... re-financed, the date such indebtedness was originally incurred ... [is] the date incurred...." *Id.* at 264. The only dispute in *Mossler Acceptance* related to the Collector's interpretation of refinancing so as to require the taxation of the general funding of the operation under the claim by the Collector that each of the numerous transactions used to maintain the running finances of the company was a refinancing so that the State sought to collect the franchise tax on all transactions. In essence, it was an interpretation that resulted almost as a tax on a substantial portion of the company's cash flow generated by all indebtedness when that indebtedness was a general aspect of the company's business—the company, in a sense, managed money, hopefully, at a profit. The Louisiana court noted the taxpayer's position:

"VI. The terms of a tax statute are not to be extended beyond their fair meaning in an effort to reach transactions which might have been taxed by the Legislature but which the Legislature did not in fact tax. Tax laws are to be liberally interpreted in favor of the taxpayer and strictly construed against the taxing authority. Any doubt or ambiguity is to be resolved in favor of the taxpayer.[7]

---

7. In construing provisions of the state amusement tax, the Court of Appeals in *Comptroller of Treasury v. Mandel, Lee, Goldstein, Burch Re–Election Comm.*, 280 Md. 575, 374 A.2d 1130 (1977), noted:

Principles relative to statutory construction were summed up for the Court by Chief Judge Murphy in *State v. Fabritz*, 276 Md. 416, 348 A.2d

*Id.* at 267. Quoting from the company's brief, after stating that the court was in accord with it, the court noted:

"As an examination of the text of this section indicates, authority is not given the Collector to establish rules and regulations to interpret the terms of the tax statute or to

275 (1975), *cert. denied,* 425 U.S. 942, 96 S.Ct. 1680, 48 L.Ed.2d 185 (1976):

"The cardinal rule in the construction of statutes is to effectuate the real and actual intention of the Legislature.... Of course, a statute should be construed according to the ordinary and natural import of its language, since it is the language of the statute which constitutes the primary source for determining the legislative intent....

Judge Mitchell said for our predecessors in *Magruder v. Hospelhorn,* 173 Md. 62, 194 A. 839 (1937):

"[A]s stated in *Gould v. Gould,* 245 U.S. 151, 38 S.Ct. 53, 62 L.Ed. 211: 'In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, and in favor of the citizen.' " *Id.* at 72, 194 A. 839.

To like effect *see Scoville Serv., Inc. v. Comptroller,* 269 Md. 390, 396, 306 A.2d 534 (1973); *McConihe v. Comptroller,* 246 Md. 271, 228 A.2d 432 (1967); *Fair Lanes v. Comptroller,* 239 Md. 157, 210 A.2d 821 (1965); *Comptroller v. Rockhill, Inc.,* 205 Md. 226, 234, 107 A.2d 93 (1954); and *Compensation Board v. Albrecht,* 183 Md. 87, 92, 36 A.2d 666 (1944).

....

... Given the ordinary meaning of the word performance, the construction placed on the word by other courts, and the principle as enunciated by the Supreme Court and repeated by this Court on a number of occasions that "[i]n case of doubt [relative to the interpretation of statutes levying taxes] they are construed most strongly against the government, and in favor of the citizen," we need go no further than to hold as a matter of law that playing a little bit of organ music behind a curtain under the circumstances of this case does not constitute a performance. Thus, no tax was due.

*Id.* at 578–85, 374 A.2d 1130.

To be sure, as expressed by Judge Eyler for this Court in *Rossville Vending Mach. Corp. v. Comptroller of Treasury,* 114 Md.App. 346, 689 A.2d 1295 (1997), the Court of Appeals has also held that statutes relating to the collection of taxes should be construed with "very great liberality." *See Surratts Assoc. v. Prince George's County,* 286 Md. 555, 566, 408 A.2d 1323 (1979). We also acknowledge that in Maryland exceptions are, generally, strictly construed. In this case, however, there is no need to interpret the statute. It is plain and clear on its face. Whether construed strictly or liberally, transfer taxes are not collectible on refinancings.

modify any of the provisions adopted by the legislature. The sole authority given the Collector is to promulgate 'reasonable rules and regulations for the purpose of the proper administration and enforcement of the provisions of each Chapter in this Subtitle. . . .'

"Obviously, the so-called 'Regulation' sought to be adopted by the Collector in 1957 went far beyond administration and enforcement of the provisions of the chapter *and constituted an effort to redefine the statutory language not as the legislature adopted it, but as the Collector would like to have it.*

*Id.* at 269 (emphasis added). The court then restated the definition of refinancing given by the company's expert:

He stated that the term "refinanced" was not too often defined specifically but was defined in several works and "ordinarily refers to the sale of securities for the purposes of paying off other obligations." He testified positively that in the field of corporation finance he had not seen any instance of the term "refinancing" being used to include the paying off of one short term loan with the proceeds of another short term loan, in the works with which he was familiar, but he did find that paying off a current liability with a long term loan was quite frequent, and that in the latter case it could come under the heading of refinancing.

*Id.* at 270. The Louisiana court held that the financing arrangement in that case was not a refinancing, relying, in part, on the argument that the Collector was attempting to redefine refinancing "as he would like to have it." The same proposition has some force in this case. As we shall later see, the transaction underlying the recording of the 1993 IDOT meets every definition of refinancing that we have and shall discuss.

We next briefly consider two cases from Maine relevant to the meaning of "refinancing." The first of these is *Bar Harbor Banking & Trust Co. v. Superintendent of Bureau of Consumer Protection*, 471 A.2d 292 (Me.1984). It involved whether Bar Harbor had violated a consumer protection provi-

sion that limited the imposition of finance charges on refinancing. The provision was designed to stop a practice called "flipping," explained as an arbitrary charge placed on a bank's distressed debtor who seeks refinancing from the bank in order to avoid default or foreclosure on the original loan. For purposes of the decision, it became necessary to determine the meaning, in that context at least, of refinancing as opposed to Bar Harbor's claim that its transactions were "renewals," not refinancings. The court relied on the general meaning.

> To avoid that result [avoidance of flipping], we need not strive to "liberally construe" the term "refinancing," however. We simply may choose the ordinary, dictionary meaning over the Plaintiff's novel, unsupported definition.

*Id.* at 295. In footnote 3, the Maine court stated: " 'Refinance' is defined as 'to finance something anew.' *Webster's New Collegiate Dictionary* 971 (1973)." *Id.* at 295 n. 3.

*Moore v. Canal Nat'l Bank,* 409 A.2d 679 (Me.1979), involved the application of the term "refinance," in respect to disclosures that are required to be made in original transactions under Maine's Consumer Credit Code and the federal Truth in Lending Act when variable rate interest provisions are involved. The court first noted that

> [a]s the trial justice observed, there is no definition of "refinance" in the Maine Consumer Credit Code or in the Uniform Consumer Credit Code of other jurisdictions that have enacted it. Dictionary definitions are not helpful in this case.

*Id.* at 685. It described the Bank's contention:

> It contends that the words "refinance" and "refinancing" are used in section 2.504 in a special technical sense to denote a transaction the terms of which are not fully controlled by those of the original loan agreement; in other words, that they denote a transaction requiring some element of new bargaining between the parties.

*Id.* at 684. As relevant to the case *sub judice,* the Maine court held:

In the case of refinancing which is negotiated during the life of the original loan and the terms of which are not controlled by the original loan agreement, if the creditor duly observes all the truth-in-lending requirements for disclosure at the time of the new loan, the consumer-debtor who seeks the refinancing is apprised of the new rate of finance charge and may govern his conduct accordingly.

*Id.* at 686. *But see Bank v. International Business Mach.*, 915 F.Supp. 491 (D.Mass.), *rev'd*, 99 F.3d 46 (1st Cir.1996) (expressing a contrasting view of refinancing when a debtor purchases its own debt in an arbitration context).

### Resolution

The refinancing in the case *sub judice* was negotiated during the life of the original loan and even if its pertinent terms were exactly the same, and there is no direct evidence on that point as we shall later indicate, its terms were not controlled by the terms of the CIGNA IDOT. The CIGNA IDOT, as far as we can discern, did not contemplate the subsequent 1993 IDOT at issue here. We now further examine the details of the case at bar, to the extent they are discernable or relevant to the various definitions of "refinancing."

At oral argument, appellee argued that the transaction was not a refinancing because there was no evidence that the transaction occurred in order for appellant to achieve more favorable terms, *e.g.*, lower interest, more favorable repayment provisions.[8] We have examined the extract and find little evidence of the terms of the underlying notes. Thus, appellee's factual argument was, for the most part, technically correct. There is, however, likewise little evidence that the operative terms (interest rate, payment schedule, etc.) are the same. Before the Tax Court, appellant conceded only that the original principal amount of the two notes and specific IDOTs

---

8. A refinancing can, in any event, occur that creates unfavorable repayment provisions. Lenders are sometimes in a position to force borrowers into refinancings that are unfavorable to the borrowers.

were the same, although the entire refinancing transaction was for a larger sum and the IDOT, as we shall indicate, may have been for a longer term. In other words, the two IDOTs, viewed in isolation from the entire transaction, were very similar. There was no evidence that we have found in the extract indicating that the other terms of payment, interest, etc., were the same, but it is clear that the refinancing transaction increased the sums financed.[9]

In the absence of the complete documentation as to the 1985 transaction, *i.e.*, the notes, we must examine the evidence that was presented to see if the transaction was something other than a refinancing.

The original IDOT was dated January 16, 1985. Normally, commercial loans of this nature, as well as most other extended loans (and we know that the original loan was in existence in 1993 and not in default), run for a standard term, *i.e.*, for 5, 10, 15, 20, 30 years, etc. If the new transaction was merely an assignment of the original,[10] its maturity dates would presumably be the same. They are not, unless the original note provided for a maturity date of thirty-three years, three months and fourteen days from January 16, 1985,[11] which would, in the area of such financing, be unusual. We explain.

The 1993 agreement, which is contained in the record, by its terms, indicates that the 1993 loan for $58,000,000 reflects that its maturity date (unless sooner accelerated) is twenty-five years from the first day of the first full month of the term. It states that the term commences on the date of the note, April 30, 1993. Thus, the twenty-five-year period is over twenty-five years from May 1, 1993, not from the date of the 1985

---

**9.** The transaction was for an amount $5,000,000 in excess of the original $58,000,000. It was intentionally split up into two IDOTs in order for appellant to pay the transfer tax on the excess—as the statute required.

**10.** Even if an assignment, it could, depending on the underlying transaction, still qualify as a refinancing.

**11.** We have not taken into consideration leap year.

IDOT. (Its periodic payments are, however, based on a twenty-year amortization.) Interestingly, the second 1993 note, evidencing an obligation of $5,000,000, had a different date of maturity, ten years, but its periodic payments were amortized on a twenty-year basis, thus creating a de facto balloon payment at the end of ten years.

We readily acknowledge that it is certainly possible for an obligation to mature on some basis other than a standard term of years. We do not, however, perceive it to be the normal practice. Accordingly, the apparently different terms of the new obligation do not support appellee's position of a mere assignment of an obligation.

We look further to certain of the other information surrounding the transaction. The Loan Agreement of April 30, 1993, between appellant and the new lender, AEW, provided in various parts:

> Borrower is indebted to ... CIGNA ... in the original principal amount of $58,000,000, as evidenced by a promissory note ... and an indemnity deed of trust and security agreement (the "CIGNA Deed of Trust")....
>
> *Borrower wishes to refinance the CIGNA Loan with* a loan from Lender in the original principal amount of $63,000,000.
>
> *Lender* and *Borrower* have agreed that Lender will purchase the CIGNA Loan for ... $58,000,000, that the CIGNA Note and CIGNA Deed of Trust *will be amended* and restated in their entirety, *and that Lender will lend an additional $5,000,000 to Borrower....*
>
> ....
>
> ... Lender hereby agrees to lend to Borrower and Borrower hereby agrees to borrow from Lender, two loans ... in the ... principal amounts of ... $58,000,000.00 (the "First Loan") and ... $5,000,000.00 (the "Second Loan") ... Borrower agrees to pay principal, interest ... as set forth in ... the "Notes". [Emphasis added.]

The 1993 IDOT provided that its intent was to "totally restate *and supersede in its entirety*" the original IDOT.

Nevertheless, the 1993 IDOT is not in the same form and does not trace the original IDOT, paragraph by paragraph, section by section. As far as form is concerned, it is somewhat different, although many provisions are similar to provisions of the original IDOT. In other words, it was more than a date change and a name change. The 1993 IDOT provided that appellant execute and deliver the Amended and Restated Promissory Note and noted a maturity date as to the new and amended note of ten years after the date of the deed of trust, unless the actual note stated an earlier time.[12]

We look also to the instructive provisions of the closing statement surrounding the funding sources and funding disbursements as to the total $63,000,000 transaction. Initially, we note that a loan of only $58,000,000 was insufficient to pay off the sum then due CIGNA. It was necessary for additional funding to be provided, i.e., the additional $5,000,000. The closing statement clearly shows a disbursement of $60,116,-422.75 to CIGNA. In our view, the closing documents suggest of no transaction other than a refinancing transaction.

At another point, in either the briefs or at oral argument, it was suggested that the fact that the original document had not been released was evidence that this was not a refinancing. We have earlier indicated that it is not necessary for the original document in the land records to be released. We would suppose that when sums of this magnitude are involved, it would, in fact, be a better practice to keep the original IDOT in place and record the subsequent IDOT with provisions in it noting it is a modification (i.e., refinancing) of the original arrangement. In this fashion, the underlying debt does not lose its priority by virtue of being released of record, but remains recorded with the refinancing explained in the subsequent IDOT. This practice would avoid relying upon equitable subrogation to maintain lien priority. *See G.E. Capital, supra.*

_____

12. We have been unable to find either of the notes in the extract.

■ In our view, the transaction here involved, evidenced by the 1993 IDOT, meets every definition of the term "refinance" of which we are aware, except that definition or position of the Director of Finance for Prince George's County. He stands alone in his position on refinancing, and the Tax Court and the circuit court erred in adopting it.

■ When the legislative entity uses the term "refinancing" without further definition, it is inappropriate for the entity enforcing the provisions to adopt anything other than the normal customary meaning of the term. In short, we hold that, generally, when a new sum of money is used to pay off a prior obligation during the term or at the conclusion of the term of the old obligation, a refinancing has occurred. The debt has been refinanced. Regardless of the document, in this case the 1993 IDOT, used to secure such a debt, the transaction evidenced by that document is a refinancing and, so long as Prince George's County grants an exemption from transfer taxes for refinancing, the exemption applies to all recorded documents evidencing the transaction, including indemnity deeds of trust. The trial court and the Tax Court were legally wrong. We reverse and direct the Director of Finance to make the refund.

■ For further clarification, we shall address another of the County's arguments. The County wants to collect transfer taxes on the full amount of the consideration to be paid under the IDOT, $58,000,000, which is, as discussed *supra*, a contingent liability. The County argues, however, that because the contingency has not occurred no obligation has arisen that can be refinanced. In other words, according to the County, although a contingent liability can be ascertained, it cannot be refinanced. As security instruments, all mortgages and deeds of trust, including indemnity deeds of trust, are contingent liabilities; that is, they are contingent upon the failure of the underlying obligation. There is no difference in that respect. For purposes of determining whether one real estate transaction has been refinanced through a second transaction, the transaction itself, as we have said and as all the

authorities we have mentioned indicate, must be examined to see if it constitutes a refinancing. It is, and we so hold and adopt, a transactional analysis that is determinative. Under a transactional analysis, the form of security document utilized to secure the refinancing is but one part of the refinancing transaction. The distinction the County seeks to draw is no distinction at all. As can be seen from the charts we attach hereto as an appendix, the original transaction, Chart A, is identical to the chart of the refinancing, Chart B. The County has conceded that A is a financing subject to tax. B is no less a financing subject to the County's refinancing exemption. The County imposes a transfer tax on indemnity deeds of trust securing original loans on the basis, apparently, that a debt is evidenced by that trust deed; a debt that is "refinanced" and secured by a second indemnity deed of trust is no less a debt. Simply stated, the County cannot have it both ways.[13]

**JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.**

---

**13.** We have noted with interest the lack of reasons presented for the County's failure to collect the transfer tax on the original, 1985, indemnity deed of trust transaction and its inability to collect the tax due on that transfer by reason of the expiration of the statute of limitations. If the County had prevailed in the case at bar, it, in effect, would be collecting that tax that it cannot collect when faced with a limitations defense.