Dear Secretary Skinner:
You have requested our opinion as to whether the Maryland Housing Fund ("MHF"), an agency in the Division of Housing Credit Assurance of the Department of Housing and Community Development ("DHCD"), had statutory authority to insure a loan made in 1994 with respect to a housing project. The Legislative Auditor has questioned the authority of MHF to insure this loan because it was an "equity take-out loan," which enabled the owner of the project to receive some of the equity accumulated during past operation of the project.
We conclude that MHF had statutory authority to insure the loan.
 I The Maryland Housing Fund
In response to an apparent shortage of affordable housing in the State, the General Assembly created MHF in 1971 with the authority to insure loans that finance affordable housing in order to stimulate private capital investment in such housing. Chapter 669, Laws of Maryland 1971. The Legislature subsequently expanded MHF's mandate to include other forms of credit enhancement and to encompass energy conservation projects, infrastructure projects, and other "public purpose projects." The law governing MHF is now codified in Annotated Code of Maryland, Article 83B, § 3-201 et seq. (the "MHF Act").
With respect to housing projects, MHF has broad authority to provide insurance and other forms of credit enhancement to assure an adequate supply of affordable housing. MHF may "insure or guarantee upon such terms as it may prescribe any mortgage or pool of mortgages . . . which are eligible for MHF insurance in accordance with [the purposes of the MHF Act]" Article 83B, § 3-204(1). The MHF Act authorizes DHCD to promulgate eligibility standards for MHF insurance and credit enhancements to ensure that such assistance shall "aid in the financing" of housing projects. Article 83B, § 3-205(a)(1)(i). "Financing" is broadly defined in the statute to include:
acquisition financing, permanent financing, short-term bridge financing, construction financing, or refinancing of any type of loan or project authorized under this subtitle.
Article 83B, § 3-202(e).
By regulation, DHCD has prescribed detailed criteria for determining the eligibility of projects, lenders, borrowers, and loans for MHF insurance. COMAR 05.06.01.05 — .09. Consistent with the purpose of the MHF Act and the broad definition of financing in the statute, the only limit that DHCD's regulations place on the use of the proceeds of an insured loan is that the loan be "used for financing or refinancing of acquisition, construction, or rehabilitation of a multi-family project." COMAR05.06.01.08F(1).
MHF has frequently insured loans that are made by the Community Development Administration ("CDA"), another agency of DHCD, out of the proceeds of tax-exempt revenue bonds issued by CDA. Among other things, CDA is charged with making loans to promote community development and affordable housing in the State. Annotated Code of Maryland, Article 83B, §§ 2-201, 2-204. CDA's loans typically are made at rates below those available from private market lenders and may also include other terms favorable to the borrower. MHF provides credit enhancement for such loans by issuing insurance to protect CDA's bondholders against the risk of default by the borrower. The favorable financing terms afforded by an MHF-insured mortgage permits the developer of a housing project to obtain a reasonable return on the developer's investment while charging lower rents than might otherwise be required with conventional financing.
To ensure that a particular transaction meets the statutory requirements and other eligibility criteria established by DHCD, there are several levels of review within the department. Before CDA issues a loan that is to be insured by MHF, the transaction is reviewed by MHF staff for compliance with the agency's regulations and underwriting guidelines, and then submitted to DHCD's Housing Finance Review Committee ("HFRC") for review.See Article 83B, § 2-202. The HFRC makes a recommendation to the Secretary, who has final authority to approve, modify, or disapprove the decision to provide MHF insurance. COMAR 05.06.01.18C-G.
 II The Hanover Square Project
The Legislative Auditor has questioned a transaction involving a CDA-financed project called Hanover Square. That project is a 198-unit apartment building in Baltimore City that, as a condition of financing by DHCD, is reserved for elderly tenants with limited incomes. Because the history of the financing of that project is important to the resolution of the question raised by the Auditor, we recount that history as we understand it in some detail.
A. The 1978 Loan
In 1978, in connection with the development of Hanover Square, CDA provided a 40-year first mortgage loan in the amount of $5.75 million to One West Conway Associates Limited Partnership ("Conway"). The loan was financed from the proceeds of CDA bonds and was insured by MHF. DHCD provided this financing at an interest rate of 8.5 per cent — a low rate at that time. In return for the favorable financing terms, Conway agreed to allocate a portion of the units in the project for low-income tenants. The project also participated in the federal Section 8 program,[1] under which Conway received federal rental subsidies with respect to all 198 apartment units in Hanover Square.
As an additional condition for receipt of the Section 8 rental subsidies, Conway agreed to limit distributions of cash proceeds from the operation of Hanover Square to no more than 8 per cent of its cash equity contribution to the project. Cash generated by the project in excess of the 8 per cent limitation was deposited into a reserve account, called the "residual receipts account," held by CDA's bond trustee for the benefit of the project.
The project operated successfully, generating an annual cash return for Conway as well as additional funds held by the CDA's bond trustee in the residual receipts account, which represented undistributed profits of Conway. In addition, according to an independent appraisal, the value of the project had increased substantially between 1978 and 1994.
B. The 1994 Loan
In 1993, Conway advised DHCD that it intended to sell or refinance the Hanover Square project. Conway indicated that its partners desired to realize the profits held in the residual receipts account and to benefit from the appreciation of the market value of Hanover Square. The partners had incurred income tax liability for the funds in the residual receipts account, which they were unable to access due to the limitation on cash distributions. In addition, Conway asserted that the limitation on return imposed by the Section 8 program had made the project an underperforming investment.
Conway initially proposed to sell the project to a non-profit entity, which intended to preserve the project as affordable housing, and asked DHCD to provide financing for the sale through a CDA loan. Conway suggested that, if DHCD did not finance the proposed sale, it would seek conventional financing, prepay the CDA mortgage, and discontinue its participation in the Section 8 program. Conway would then be able to rent the apartments in Hanover Square at market rents, with no restriction on the income levels of the tenants. This would have resulted in the loss of a substantial number of affordable housing units in Baltimore City for low-income elderly tenants.[2]
The proposal to sell Hanover Square to a non-profit entity did not go forward. To avoid the loss of affordable housing for Baltimore City that would have resulted from a conventional refinancing of the project, DHCD then agreed to refinance the project itself.
In April 1994, CDA and Conway negotiated a loan in the amount of $2.833 million, secured by a new first mortgage on the project in a shared first lien position with the 1978 mortgage. As with the initial loan, the new loan was financed through the issuance of CDA revenue bonds. As an "equity take-out" loan, the transaction permitted the owners to borrow against the appreciated value of the project.[3] In exchange, DHCD obtained a covenant from Conway to preserve the affordability of the project for the remaining term of the original mortgage, and an additional covenant extending the term of the affordability restrictions to 2033 — 13 years beyond the term of the first CDA mortgage. The covenants guaranteeing the affordable nature of Hanover Square were recorded in the land records. The transaction was subject to the usual staff review and received the endorsement of the HFRC[4] prior to its approval by the Secretary.
Like the first Hanover Square loan, the 1994 loan was insured by MHF. You have requested our opinion on the authority of MHF to provide the credit enhancement for this transaction.
 III Discussion
The original development of Hanover Square was financed in 1978 by a mortgage funded and insured under DHCD's affordable housing programs. There is no question that MHF was authorized to insure the 1978 loan as it related to the "financing or refinancing of acquisition, construction or rehabilitation of a multi-family project." The question raised by the Auditor is whether the insurance provided by MHF as part of the 1994 transaction was within its authority. The answer to that question turns on whether the 1994 transaction can properly be characterized as a "refinancing of acquisition, construction, or rehabilitation" of the Hanover Square project.
The term "refinancing" is not defined in the MHF Act. Nor is it a term of art that denotes a particular form of transaction. Rather, it may encompass a variety of transactions, depending on the context in which the term is used. In a recent case, the Court of Special Appeals discussed at length the meaning of that term in deciding whether a particular transaction was a "refinancing" for purposes of an exemption from a county real estate transfer tax. Springhill Lake Investors LimitedPartnership v. Prince George's County, 114 Md. App. 420,690 A.2d 535, cert. denied, 346 Md. 240 (1997).
Like the MHF Act, the tax ordinance in Springhill did not itself define "refinancing" for purposes of the exemption. The court stated that "[w]hen the legislative entity uses the term `refinancing' without further definition, it is inappropriate for the entity enforcing the provisions to adopt anything other than the normal customary meaning of the term."114 Md. App. at 443. To measure the possible scope of that term, the court canvassed alternate definitions of "refinancing"in other State statutes, legal encyclopedias, dictionaries, treatises, and court decisions from other jurisdictions.Id. at 431-39. Among the definitions that the court cited with approval were two dictionary definitions: (1)"to finance again or anew; to pay off existing debts with funds secured from new debt; to extend the maturity date and/or increase the amount of an existing debt; to arrange for a new payment schedule"; and (2) "to renew or reorganize the finance of; to finance something anew." Id. at 434 quotingBlack's Law Dictionary 980 (6th ed. 1991); Webster's New Collegiate Dictionary 989 (1991). The court also referred to the broad definition of "refinancing" in the State usury law: "increasing or altering the balance due, the term, or the interest rate of any existing loan or paying off an existing loan whether or not the lender also made the existing loan." Annotated Code of Maryland, Commercial Law Article, § 12-103(b)(2). In the case before it, the court concluded stated that "generally, when a new sum of money is used to pay off a prior obligation during the term of the old obligation, a refinancing has occurred." 114 Md. App. at 443.
In construing a term such as "refinancing," one cannot lose sight of the underlying purpose of the statute in which the term appears. In Truitt v. Board of Public Works,243 Md. 375, 393-394, 221 A.2d 370 (1966), the Court of Appeals construed that term as it appeared in the hospital construction act, which was designed to encourage the construction of new hospitals and which forbade the use of funds under the act for "refinancing" an existing loan of a hospital. The Court held that the statutory prohibition did not apply to the use of funds to replace temporary loans obtained in anticipation of a construction loan under the act, because such a transaction furthered the legislative purpose of encouraging the construction of hospitals.
Although, as in Springhill itself, a "refinancing" often involves replacement of a prior debt with a new one, it may also involve a transaction that changes the term, amount, or other conditions of an existing debt without extinguishing the earlier debt. The 1994 transaction involving Hanover Square is consistent with several of the definitions of "refinancing" cited in Springhill. It involved a restructuring of the existing debt by increasing the amount of the total debt secured by a first mortgage on the property with an additional sum at a different interest rate and by extending some of the conditions of the original loan. Thus, the 1994 transaction may properly be characterized as a refinancing of the 1978 loan, which was indisputably for "the acquisition, construction, or rehabilitation of a multi-family project."
The 1994 transaction was also consistent with MHF's mandate to preserve affordable housing. DHCD concluded that, if it did not provide refinancing, the developer might otherwise eliminate the restrictions that made Hanover Square affordable to elderly low-income tenants. The increase in value of the property between 1978 and 1994 meant that additional funds could be loaned and secured by the same property to avoid that possibility and to preserve the project as affordable housing. Given the available alternatives and market conditions at the time, DHCD determined that the refinancing of Hanover Square was an effective way to achieve that objective. In interpreting a statute, the courts accord substantial deference to the interpretation of the agency charged with administering it. See Maryland State Retirementand Pension System v. Hughes, 340 Md. 1, 8, 664 A.2d 1250
(1995).
The fact that part of the proceeds of the 1994 loan was retained by Conway as a return on its investment in Hanover Square does not mean that the transaction was outside MHF's statutory authority. Nothing in the MHF Act prohibits the agency from insuring a loan that preserves affordable housing by allowing investors in a project to access their accumulated equity in the project. Moreover, the statute explicitly contemplates that private party will benefit from the proceeds of an insured loan. For example, the statute expressly authorizes insurance of the "acquisition" of real estate. In a loan that finances a real estate acquisition, the proceeds of the loan are paid to the seller of the real estate — typically, a private party that likely profits from the transaction. Similarly, the equity take-out portion of the 1994 loan compensated the investors in Hanover Square for the accumulated profits and enhanced value of the project since the 1978 loan.
 IV Conclusion
The 1994 transaction may properly be characterized as a refinancing of loan for an affordable housing project. DHCD found that the transaction would preserve a successful housing project for low income elderly tenants in Baltimore City and thus served the purposes of the MHF Act. Accordingly, in our opinion, it was within MHF's statutory authority to insure that loan.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 William N. Fitzpatrick, Jr. Assistant Attorney General
 Honora W. Sutor Assistant Attorney General
 Robert N. McDonald Chief Counsel Opinions Advice
 Housing — Maryland Housing Fund — Authority to Insure Refinancing of Loan for Affordable House
[1] 42 U.S.C. § 1437a, 1437c, 1437f, 3535(d), 12701, and 13611-19, and regulations promulgated thereunder at 24 C.F.R. §§ 880-88.
[2] The situation that confronted DHCD in 1994 with respect to Hanover Square was not unique. A standard term of the government subsidized and insured mortgages that supported the construction of affordable housing during the 1960's and 1970's permitted the prepayment of a mortgage after 20 years and the release of the project from housing affordability restrictions. Thus, in the late 1980's and early 1990's, many housing projects that had been financed with government assistance became eligible to prepay those mortgages and discontinue the affordability restrictions attached to the financing. At the same time, rental vacancies were low in many areas of the country, and low-cost private capital was readily available to refinance the projects without restrictions. It was feared that a flood of prepayments would aggravate the shortage of affordable housing. See Cohen Mattis, Prepayment Rights: Abrogation by the Low-IncomeHousing Preservation and Resident Homeownership Act of 1990, 28 Real Prop. Prob. Tr. J. 1, 4-6 (1993).
[3] Equity take-out loans are sometimes used by public housing agencies to preserve affordable housing projects. In particular, they are one element of transactions encouraged by federal legislation to help refinance low-income housing projects while maintaining the projects as affordable housing — the Emergency Low Income Housing Preservation Act,12 U.S.C. § 1715(1), and the Low Income Housing Preservation and Resident Homeownership Act, 12 U.S.C. § 4101 et seq., See
Ramsey, et al., The Cranston-Gonzalez National AffordableHousing Act — An Overview, 28 Real Prop. Prob. Tr. J. 177, 229, 235 (1993); Cohen Mattis, supra, at 19-20.
[4] The HFRC found that the transaction would "keep the project as federally assisted low income housing for the remainder of its economic life." HFRC minutes (May 13, 1994).
 *Page 18