DEBORAH S. EYLER, J.
 

 The Circuit Court for Montgomery County granted summary judgment in favor of Roger H. Moore, the appellee, in a breach of guaranty action brought against him by Middle-brook Tech, LLC (“Middlebrook”), the appellant. On appeal, Middlebrook presents three questions for review, which can be distilled into the single question of whether the circuit court’s decision to grant summary judgment was legally incorrect.
 
 [1]
 
 
 *46
 
 For the following reasons, we shall reverse the circuit court’s decision and remand the case to that court for further proceedings.
 

 FACTS AND PROCEEDINGS
 

 In 1980, Moore founded Optim Electronics Corporation (“Optim”), a Maryland corporation with its principal place of business in Germantown, Montgomery County. Optim was in the business of manufacturing electronic measuring systems for use in industry. At Optim’s inception, Moore was its president and sole stockholder. At a time not specified in the record, but prior to 1992, Moore sold all of his stock in Optim to Bowthorpe, LLC, a British company. He remained as president of Optim, under an employment contract.
 

 On April 30, 1992, Optim entered into a Lease Agreement (“Lease”) with Brooke Venture Limited Partnership (“Brooke”), the predecessor-in-interest to Middlebrook. Pursuant to the Lease, Optim rented from Brooke commercial office space on the second floor of a building located at 12401 Middlebrook Road, in Germantown (“the Leased Premises”). The Lease was for a five-year term, ending on April 30, 1997. It established an annual rent, payable in monthly installments.
 

 As pertinent to this case, section 15 of the Lease, entitled “Default Provisions,” stated,
 
 inter alia,
 
 that the tenant would be in default for failure to pay rent ten days after the time it was due. The Lease also contained, as section 26, a “Holding Over” clause, stating that, if the tenant should hold possession
 
 *47
 
 of the Leased Premises after the end of the term, the tenant would be
 

 deemed to be occupying the Leased Premises as a Tenant from month to month, at double the Rent, adjusted to a monthly basis, and subject to all the other conditions, provisions, and obligations of this Lease insofar as the same are applicable, or as the same shall be adjusted, to a month-to-month tenancy.
 

 Finally, also as relevant to this case, the Lease contained the following “Bankruptcy Termination Provision,” at section 16:
 

 This Lease shall automatically terminate and expire, without the performance of any act or the giving of any notice by Landlord, upon the occurrence of any of the following events: (1) Tenant’s admitting in writing its inability to pay its debts generally as they become due, or (2) the commencement by Tenant of a voluntary case under the federal bankruptcy laws ... or any other applicable federal or state bankruptcy, insolvency or other similar law, or (3) the entry of a decree or order for relief by a court having jurisdiction in the premises in respect of Tenant in an involuntary case under the federal bankruptcy laws ... or any other applicable federal or state bankruptcy, insolvency or other similar law, and the continuance of any such decree or order unstayed and in effect for a period of 30 consecutive days, or (4) Tenant’s making an assignment of all or a substantial part of its property for the benefit of its creditors, or (5) Tenant’s seeking or consenting to or acquiescing in the appointment of, or taking possession by, a receiver, trustee, or custodian for all or a substantial part of its property, or (6) the entry of a court order without Tenant’s consent, which order shall not be vacated, set aside or stayed within 30 days from the date of entry, appointing a receiver, trustee or custodian for all or a substantial part of its property. The provisions of this Section 16 shall be construed with due recognition for the provisions of the federal bankruptcy laws, where applicable, but shall be interpreted in a manner which results in a termination of this Lease in
 
 *48
 
 each and every instance, and to the fullest extent and at the earliest moment that such termination is permitted under the federal bankruptcy laws, it being of prime importance to the Landlord to deal only with Tenants who have, and continue to have, a strong degree of financial strength and financial stability.
 

 In 1993, Brooke conveyed its interest in the Leased Premises to a life insurance company, which in 1996 reconveyed that interest to First Amsterdam Realty, LLC (“First Amsterdam”).
 

 On February 25, 1997, Optim and First Amsterdam entered into an Amendment to the Lease (“Amendment”) that, among other things, extended the Lease term for five years, from May 1, 1997, to April 30, 2002 (“the Extended Term”). In addition, the Amendment gave Optim an option to renew the Lease term for an additional five years, from May 1, 2002, to April 30, 2007 (“the Renewal Term”). Section 2(b) of the Amendment stated:
 

 Provided that Tenant is not then in default of any of the terms and conditions of this Lease, Tenant shall have the right to renew this Lease for one (1) additional term of five (5) years commencing on May 1, 2002 and terminating on April 30, 2007 ... provided that for Tenant to validly exercise the option for the Renewal Term, Tenant shall give Landlord written notice at least one (1) year prior to the expiration of the Extended Term, and provided that there shall be no further right of renewal.
 

 Sometime thereafter, but before December 7, 1999, First Amsterdam conveyed its interest in the Leased Premises to Middlebrook.
 

 On December 7, 1999, Moore executed an “Unconditional Guaranty of Lease Agreement” (“Guaranty”). The Guaranty was given in connection with Bowthorpe’s sale of all of Optim’s stock to Trident Analytical, Inc., a wholly owned subsidiary of Trident Overseas Limited (collectively “Trident”), also a British Company. The Guaranty states:
 

 
 *49
 
 In consideration of and as a material inducement of [Middle-brook] ... to consent to the transfer of all or part of the capital stock of [Optim] from [Bowthorpe to Trident], which consent is required pursuant to [the Lease and Amendment] ... [Moore] hereby unconditionally and absolutely guarantees unto [Middlebrook] . .., the full, prompt and complete payment of any amounts of rent, minimum rent, additional rent, or any additional payment, as these terms may be provided for and used in the [Lease] to be paid by [Optim], and the complete and prompt observance and performance by [Optim] of all the terms, covenants and conditions of the Lease on [Optim’s] part to be performed or observed.
 

 Two days later, on December 9, 1999, Trident entered into a loan agreement with the Bank of Scotland (“BOS”). At the same time, Trident, Optim, and the BOS entered into a Security Agreement, by which Trident pledged what amounted to all of Optim’s assets as security for the BOS loan. A Financing Statement was recorded, granting BOS a first priority security interest in all of Optim’s personal property.
 

 About a year and a half later, on April 20, 2001, Moore, in his capacity as President of Optim, sent Middlebrook a letter stating that it was Optim’s intent to renew the Lease for the five year Renewal Term (May 1, 2002 to April 30, 2007) (“the Renewal Letter”).
 

 Ultimately, Trident defaulted on the BOS loan. On August 30, 2001, Trident was forced by the BOS into an “administrative receivership” in the United Kingdom, under a debenture held by the BOS. Two accountants with the firm of Arthur Andersen in Great Britain were appointed “Joint Administrative Receivers” of Trident.
 

 On December 31, 2001, Moore’s employment contract with Optim expired and was not renewed. Optim continued operating for the first two weeks of January 2002, but its employees were not paid. On February 8, 2002, Optim’s employees and Moore filed a petition, in the United States Bankruptcy Court for the District of Maryland (“Bankruptcy Court”), seeking to place Optim in involuntary bankruptcy under Chapter 7 of the
 
 *50
 
 federal bankruptcy code. On March 13, 2002, the Bankruptcy Court issued an order granting that relief. Thereafter, in April 2002, the Bankruptcy Court appointed Michael Wolff, Esquire, as Trustee for Optim.
 

 Beginning in March 2002, Optim ceased making any rent payments under the Lease.
 

 On May 13, 2002, in the bankruptcy case, Middlebrook filed a motion for relief from the automatic stay imposed by section 362(a) of the bankruptcy code. It argued that the Lease term ended on April 30, 2002, and that, from May 1, 2002 on, Optim was occupying the Leased Premises as a holdover tenant, under section 26 of the Lease. Its argument that the Lease was not renewed was twofold: that, as of the date of the Renewal Term (May 1, 2002), Optim was in default, for nonpayment of rent, and therefore could not exercise the renewal option; and that the Renewal Letter was ineffective because it was not sent by registered or certified mail, as required under a notice provision of the Lease.
 

 Middlebrook further argued that, in any event, even if the lease were renewed, it was deemed rejected by the Trustee, as of May 12, 2002, under Section 365(d)(4) of the bankruptcy code, and therefore Middlebrook was entitled to immediate possession of the Leased Premises.
 

 On June 7, 2002, the Bankruptcy Court entered an order granting Middlebrook’s motion for relief from the automatic stay. The court ordered that the Lease was deemed rejected on May 13, 2002, pursuant to section 365(d)(4). It further ordered
 

 that the automatic stay ... be and hereby is terminated as to [Middlebrook], and that [Middlebrook] may exercise all of its contractual and/or State law rights and remedies under its Lease ..., and Trustee shall consent to such State Court relief; however, [Middlebrook] shall forbear from execution on its judgment until the earlier of July 26, 2002 or 11 days after final order approving sale of collateral in the Leased Premises; and it is further
 

 ORDERED, that [Middlebrook] shall have access to the Leased Premises with prior notice to Trustee; and Trustee
 
 *51
 
 shall provide keys and alarm code for this purpose to show Leased Premises to prospective tenants; and Trustee shall maintain insurance on Leased Premises as required by Lease; and it is further
 

 ORDERED!,] that [Middlebrook] shall have an administrative claim for rent until the Leased Premises are vacated.
 

 On February 4, 2003, in the Circuit Court for Montgomery County, Middlebrook filed a complaint for breach of guaranty against Moore. Middlebrook alleged that Optim had renewed the Lease for the Renewal Term (May 1, 2002 to April 30, 2007), but had breached the Lease by failing to pay rent from March 2002 forward. It sought recovery from Moore, on his Guaranty, of approximately $210,000 in unpaid rent and late fees allegedly owed by Optim, through January 2003, plus 18% interest. Middlebrook attached copies of the Lease, Amendment, Guaranty, and April 20, 2001 renewal letter to its complaint.
 

 Middlebrook’s complaint was filed with an accompanying motion for summary judgment and request for hearing. The motion was supported by an affidavit by an officer of Middle-brook attesting that the allegations in the complaint were true and the documents attached to the complaint were authentic. Middlebrook did not file a memorandum of law in support of its motion for summary judgment.
 

 Moore filed an answer to the complaint, an opposition to Middlebrook’s motion for summary judgment, and a cross-motion for summary judgment.
 

 Moore advanced numerous, alternative arguments in opposition to Middlebrook’s motion for summary judgment. First, he argued that the Lease was not renewed, for four reasons: 1) a written renewal amendment was not signed and the Renewal Letter was not in and of itself effective to extend the Lease for the Renewal Term; 2) the Renewal Letter could not satisfy the statute of frauds; 3) Optim could not renew the Lease because at the inception of the Renewal Term it was in default for failure to pay rent; and 4) at the inception of the Renewal Term, Optim lacked the capacity to renew the Lease because it was in involuntary bankruptcy and only could act
 
 *52
 
 through its Trustee (who did not renew the Lease and indeed was deemed by the Bankruptcy Court to have rejected it). Moore further argued that, because the Lease was not renewed, Optim was a month-to-month tenant until it vacated the premises in July 2002, and any liability of Optim on the Lease ended at that time. Because Middlebrook received administrative rent in the bankruptcy case covering that period, nothing was owed by Optim and therefore nothing was owed by Moore on the Guaranty.
 

 Second, Moore argued that, under section 16 of the Lease, the Lease automatically terminated before the Renewal Term, by either one of two triggering events. Under section 16(4), the Lease terminated on December 9, 1999, when the Security Agreement was signed, because, by pledging its assets as collateral for the BOS loan to Trident, Optim “mad[e] an assignment of all or a substantial part of its property for the benefit of its creditors.” Alternatively, under section 16(6), the Lease automatically terminated on August 30, 2001, when the Joint Administrative Receivers were appointed.
 
 [2]
 
 Moore took the position that automatic termination of the Lease meant that Moore ceased to have any liability under the Guaranty because the obligations he was guaranteeing no longer existed, and to extend his Guaranty to cover a holdover tenancy not covered by the Lease for an insolvent business would be to impose on him a new and entirely different obligation from that which he had agreed to.
 

 
 *53
 
 Third, Moore argued that Optim’s involuntary bankruptcy was a “supervening impracticality” that discharged Optim’s duty of performance under the Lease. Fourth, he argued that Optim’s insolvency “completely frustrated the purpose” of the Lease, so its original purpose could not be achieved, thus permitting it to be terminated by Optim. Fifth, Moore argued that Middlebrook failed to mitigate its damages by limiting its claim against Optim to the administrative rent, of approximately $78,000, that it received in the bankruptcy case, when there were adequate funds in the bankruptcy estate to pay Middlebrook’s full claim. Finally, Moore argued that Optim had no liability under the Lease after July 2002 because Middlebrook insisted that Optim vacate the premises as of that time and Optim did so. Moore maintained that, under all of these scenarios, Optim had no obligations to Middlebrook under the Lease and therefore he had no liability under the Guaranty.
 

 In support of his cross-motion for summary judgment, Moore reasserted that he was obligated under the Guaranty only if the Lease was in effect and Optim was bound by it. When the Lease automatically terminated, by one of two triggering events under section 16, as Moore argued was the case, Optim’s obligation under the Lease terminated and his Guaranty terminated as well. If Optim was released from its duty of performance under the Lease, either due to the “supervening impracticality” of its involuntary bankruptcy or due to frustration of purpose of the Lease, Moore’s obligation under the Guaranty likewise ceased. If that was not the case but the Lease was not renewed, his obligation only was for the holdover period, for which Middlebrook already was compensated. If the Lease was renewed, his Guaranty did not apply, because he only had agreed to guarantee the obligations of Optim as a financially sound going concern, not as an insolvent company. Moore also argued that the Guaranty was not enforceable because it was not supported by consideration.
 

 Middlebrook filed an opposition to Moore’s cross-motion for summary judgment, addressing the points raised. It argued
 
 *54
 
 that the Renewal Letter was all that was required to effectively extend the Lease and that the statute of frauds was satisfied by the Lease itself. It further argued that Optim was not in default or in bankruptcy when the Lease term was extended by the Renewal Letter, and therefore Optim satisfied the preconditions and had the capacity to renew the Lease and extend the Lease term; it only went into default after the Lease term was extended. Therefore, the Lease was in effect for the remainder of the Renewal Term, that is, through April 2007. Middlebrook asserted that Optim’s insolvency did not discharge Moore from his obligation under the Guaranty.
 

 In response to the arguments advanced by Moore under section 16 of the Lease, Middlebrook asserted that the entire section was invalid as an
 
 “ipso facto
 
 clause,” prohibited by section 365(3)(1) of the federal bankruptcy code. Middlebrook further argued that even if section 16 were effective and operated to terminate the Lease, or if Optim’s bankruptcy terminated its obligations under the Lease, as guarantor, Moore would step into Optim’s shoes, and become liable under the Lease in any event. Middlebrook further asserted that the doctrines of “supervening impracticability” and “frustration of purpose” were inapplicable, and would not eliminate Moore’s liability under the Guaranty in any event, and that Middlebrook did not limit the sum it could recover against Moore under the Guaranty by accepting approximately $78,000 in administrative rent in the bankruptcy case.
 

 Although the date is not discernible from the record, it appears that sometime not long before the scheduled hearing on the summary judgment motions, which had been postponed, counsel for the parties obtained copies of the motion for relief from automatic stay filed by Middlebrook in the bankruptcy case and the Bankruptcy Court’s June 7, 2002 order granting that relief.
 

 The case came on for a hearing before the circuit court on May 21, 2003.
 
 [3]
 
 Middlebrook argued that, notwithstanding
 
 *55
 
 Optim’s bankruptcy, Moore remained fully liable on his Guaranty of the obligations in the Lease; indeed, the purpose of the Guaranty was to protect Middlebrook in the event of insolvency of Optim. Middlebrook’s counsel acknowledged having argued in the bankruptcy case that Optim had
 
 not
 
 renewed the Lease for the Renewal Term. He maintained, however, that the Bankruptcy Court did not decide the renewal issue and, in any event, the bankruptcy case did not involve Moore. He asserted that the undisputed facts established that the Lease had been renewed, that rent had not been paid from March 2002 forward, and that Moore was liable, on his Guaranty, for the sums owed in rent under the Lease that were not paid and had not been reimbursed by administrative rent in the bankruptcy case.
 

 Counsel for Moore focused her argument on section 16 of the Lease, asserting that the Lease had terminated automatically either on December 9, 1999, when Optim entered into the Security Agreement, or in August 2001, when the Joint Administrative Receivers were appointed. She maintained that, from the date the Lease had terminated forward, Optim was occupying the premises as a month-to-month holdover tenant,
 
 *56
 
 not under the Lease, because it no longer existed, but by law. Because the Lease had terminated, Moore no longer had any liability on his Guaranty, because the obligations that he had guaranteed no longer existed.
 

 Moore’s counsel further argued that, even if the Lease did not expire before the involuntary bankruptcy petition was filed, Optim did not effectively exercise the option to renew the Lease for the Renewal Term, because a condition precedent to renewal was that Optim not be in default at the time of the Renewal Term (that is, as of May 1, 2002), and that condition was not satisfied, because Optim had failed to pay rent for March and April 2002. Therefore, the Lease expired on April 30, 2002.
 
 [4]
 
 In that regard, Moore’s counsel advanced an argument not made in his memorandum in support of cross-motion for summary judgment, and therefore not briefed for the court: that by advocating before the Bankruptcy Court, in support of the motion to stay, that the Lease had not been renewed, Middlebrook was judicially estopped to argue in the breach of guaranty case against Moore that the Lease had been renewed. Counsel asserted that, on the basis of the non-renewal position it took in the bankruptcy ease, Middle-brook was granted relief from the automatic stay, and was able to retake possession of the Lease Premises.
 

 At the conclusion of the hearing, the circuit court ruled: [Middlebrook] had previously taken the position in the bankruptcy matter ... that Section 16 of the lease governed and resulted in termination of the lease.
 

 I am inclined to agree with the position that [Middle-brook] took in the bankruptcy court, with regard to Section 16 of the lease, for the reasons stated by Middlebrook and the additional reasons set forth today.
 

 
 *57
 
 It seems to me that by operation of the lease, that the lease itself was terminated; and I think that the position that [Middlebrook] take[s] in this matter is not only inconsistent with the position [it] has previously taken, but I think it is inconsistent with the facts which appear undisputed with regard to the triggering events; but also find that— it seems to me that the doctrine of judicial estoppel was created to prevent the very thing that [Middlebrook] is doing here, and that is, asserting a contrary position in another case concerning essentially the same subject matter and asserting those inconsistent positions when it is depending upon whether it is to its benefit or detriment to assert the position taken.
 

 I am going to grant—I do find there is no genuine dispute as to material fact. I am going to grant [Moore’s] motion for summary judgment and deny [Middlebrook’s] motion for summary judgment....
 

 On May 28, 2008, the circuit court entered an order denying Middlebrook’s motion for summary judgment and granting Moore’s cross-motion for summary judgment. Within ten days, Middlebrook filed a motion for reconsideration, which was denied in a brief order, without a hearing. Middlebrook then filed a timely notice of appeal.
 

 DISCUSSION
 

 Standard of Review of Grant of Motion for Summary Judgment
 

 Under Rule 2-501, a circuit court may grant summary judgment upon a finding that the material facts are not in genuine dispute and the moving party is entitled to judgment in its favor as a matter of law.
 
 Beyer v. Morgan State Univ.,
 
 369 Md. 335, 359-60, 800 A.2d 707 (2002);
 
 Schmerling v. Injured Workers’ Ins. Fund,
 
 368 Md. 434, 443, 795 A.2d 715 (2002);
 
 Lippert v. Jung,
 
 366 Md. 221, 227, 783 A.2d 206 (2001). The court’s decision on both issues is a legal decision.
 
 Maryland Dept. of the Environment v. Underwood,
 
 368 Md. 160, 171, 792 A.2d 1130 (2002);
 
 Philadelphia Indem. Ins. Co. v.
 
 
 *58
 

 Maryland Yacht Club, Inc.,
 
 129 Md.App. 455, 465, 742 A.2d 79 (1999). Accordingly, we review the grant of summary judgment
 
 de novo. Beyer, supra,
 
 369 Md. at 359-360;
 
 Schmerling, supra,
 
 368 Md. at 443, 795 A.2d 715;
 
 Fister v. Allstate Life Ins. Co.,
 
 366 Md. 201, 210, 783 A.2d 194 (2001). If the moving party offers more than one basis for its summary judgment argument, and the court rules on one basis, we review the court’s decision on that issue. We do not review the issues that did not form the basis for the court’s ruling, unless the court would have had no discretion but to grant summary judgment on one of those bases. Maryland Rule 8-131(a);
 
 Sadler v. Dimensions Healthcare Corp.,
 
 378 Md. 509, 537, 836 A.2d 655 (2003);
 
 Blades v. Woods, 338
 
 Md. 475, 478, 659 A.2d 872 (1995)(quoting
 
 Gross v. Sussex Inc.,
 
 332 Md. 247, 254 n. 3, 630 A.2d 1156 (1993));
 
 Orkin v. Holy Cross Hosp. of Silver Spring, Inc.,
 
 318 Md. 429, 435, 569 A.2d 207 (1990).
 

 Analysis
 

 Before addressing Middlebrook’s contentions, it will be helpful to give an overview of some of the pertinent Maryland law respecting third party contractual obligors and the relevant federal law respecting the effect of bankruptcy proceedings on executory contracts and leases of the debtor.
 

 In Maryland, there are two types of third-party contractual obligors: guarantors and sureties.
 
 Mercy Medical Center, Inc. v. United Healthcare of the Mid-Atlantic, Inc.,
 
 149 Md.App. 336, 357, 815 A.2d 886 (2003). A suretyship contract
 

 is a tripartite agreement among a principal obligor, his obligee, and a surety. This contract is a direct and original undertaking under which the surety is primarily liable with the principal obligor and therefore is responsible at once if the principal obligor fails to perform.
 

 General Motors Acceptance Corp. v. Daniels,
 
 303 Md. 254, 259, 492 A.2d 1306 (1985).
 
 See also Atl. Contracting & Material Co. v. Ulico,
 
 380 Md. 285, 844 A.2d 460 (2004), . “The liability of a surety is coextensive with that of the principal.
 
 *59
 
 The surety is primarily or jointly liable with the principal and, therefore, is immediately responsible if the principal fails to perform.”
 
 Ulico, swpra,
 
 380 Md. 285, 844 A.2d 460 (citing
 
 Gen. Builders Supply Co. v. MacArthur,
 
 228 Md. 320, 326, 179 A.2d 868 (1962)). “Ultimate liability rests upon the principal obligor rather than the surety, but the obligee has a remedy against both. The surety, however, becomes subrogated to the rights of the obligee when the surety pays the debt for the principal obligor.”
 
 General Motors, supra,
 
 303 Md. at 259, 492 A.2d 1306.
 

 A guaranty is a form of commercial obligation in which the guarantor promises to perform if his principal does not.
 
 Mercy Medical Center, supra,
 
 149 Md.App. at 361, 815 A.2d 886 (quoting
 
 General Motors, supra,
 
 303 Md. at 260, 492 A.2d 1306, and
 
 Walton v. Washington County Hosp. Ass’n,
 
 178 Md. 446, 450, 13 A.2d 627 (1940)). As distinguished from a contract of suretyship, a contract of guaranty
 

 is collateral to and independent of the principal contract that is guaranteed and, as a result, the guarantor is not a party to the principal obligation. A guarantor is therefore secondarily liable to the creditor on his contract and his promise to answer for the debt, default, or miscarriage of another becomes absolute upon default of the principal debtor and the satisfaction of the conditions precedent to liability.
 

 General Motors, supra,
 
 303 Md. at 260, 492 A.2d 1306. “Because ‘[t]he liability of a ... guarantor is created entirely by his contract, it is strictly confined and limited to his contract.’ ”
 
 Mercy Medical Center, supra,
 
 at 361-62, 815 A.2d 886 (quoting
 
 Plunkett v. Davis Sewing-Mach. Co.,
 
 84 Md. 529, 533, 36 A. 115 (1897)). For that reason, no change can be made to the guaranty without the guarantor’s consent.
 
 Plunkett, supra,
 
 84 Md. at 533, 36 A. 115.
 

 As Moore acknowledges in his brief and the papers he filed below, the contractual obligation he gave in the Guaranty was in the nature of a surety agreement, because it guaran
 
 *60
 
 teed performance of the obligations of Optim under the Lease, not performance by Optim of those obligations.
 

 The federal bankruptcy laws are codified in 11 U.S.C. sections 361,
 
 et seq.
 
 Section 365, entitled “Executory contracts and unexpired leases,” provides,
 
 inter alia,
 
 that, with certain exceptions and subject to the Bankruptcy Court’s approval, the trustee of a debtor may assume or reject an unexpired lease of the debtor. § 365(a).
 
 See also In re Alongi,
 
 272 B.R. 148, 152-53 (Bankr.D.Md.2001). In a case under Chapter 7 of the Bankruptcy law, if within 60 days of the granting of relief by the bankruptcy court, the trustee does not assume or reject an unexpired lease of non-residential real property under which the debtor is the lessee, the lease is deemed rejected, and the trustee shall immediately surrender the real property to the lessor. Section 365(d)(1);
 
 In re Alongi, supra,
 
 272 B.R. at 153.
 

 Rejection of the unexpired lease does not terminate the lease. Rather, it means that the debtor’s estate will not become a party to the lease and that the lease is not part of the bankruptcy estate and is not under the jurisdiction of the Bankruptcy Court.
 
 In re Alongi, supra,
 
 272 B.R. at 153. The rejection of the lease constitutes a breach by the debtor that is considered to have occurred immediately prior to the filing of the bankruptcy petition. Section 365(g);
 
 RCC Tech. Corp. v. Sunterra Corp.,
 
 287 B.R. 864, 866 n. 3 (D.Md.2003),
 
 rev’d on other grounds, In re Sunterra Corp.,
 
 No. 03-1193, 361 F.3d 257, 2004 WL 527832 (4th Cir.) (Md. Mar. 18, 2004);
 
 In re Alongi, supra,
 
 272 B.R. at 154.
 

 The breach of the unexpired lease by the debtor lessee entitles the non-debtor lessor to regain possession of the leased premises. Section 365(d)(4);
 
 In re Park,
 
 275 B.R. 253, 257 (Bankr.E.D.Va.2002). It further entitles the non-debtor lessor to file what is treated as a prepetition, unsecured claim for damages against the debtor. Section 365(g)(1);
 
 In re Park, supra,
 
 275 B.R. at 256;
 
 In re Milstead,
 
 197 B.R. 33, 36 (Bankr.E.D.Va., 1996). The claim is subject to a statutory cap under section 502(b)(6). When the trustee rejects an unex
 
 *61
 
 pired lease of non-residential real property, the trustee must pay rent that has accrued from the date of the filing of the petition to the date the lease is rejected. Section 503;
 
 In re Standard Furniture, Co.,
 
 3 B.R. 527, 530 (Bankr.S.D.Cal.1980).
 

 A lease that terminated before the debtor’s bankruptcy petition was filed, and therefore has no unexpired term, is not an unexpired lease for purposes of section 365.
 
 See In re Pagoda Intern., Inc.,
 
 26 B.R. 18, 21 (Bankr.D.Md.1982) (observing that a bankruptcy court cannot act to resurrect a lease that was terminated before the filing of bankruptcy petition).
 
 See also In re Greenfield Dry Cleaning & Laundry, Inc.,
 
 249 B.R. 634, 641 (Bankr.E.D.Pa.2000). In deciding whether a lease in fact was terminated prior to the bankruptcy petition’s being filed, the Bankruptcy Court looks to state law. Section 365(d)(3);
 
 Norritech v. Geonex Corp.,
 
 204 B.R. 684, 687 (D.Md.1997). The determination of property rights under a lease, including the right to future rent, is governed by state law and the agreements between the parties.
 
 In re Merry-Go-Round Ent., Inc.,
 
 180 F.3d 149, 161-62 (4th Cir.1999);
 
 In re Steven Windsor, Inc.,
 
 201 B.R. 133 (Bankr.D.Md.1996).
 

 In
 
 Rel-Ken Associates Ltd. Partnership v. Clark,
 
 83 B.R. 357 (D.Md.1988), the court held that the statutory limitation on a non-debtor landlord’s claim against a debtor lessee’s obligation under an unexpired lease of nonresidential real property that comes into play when the trustee rejects or is deemed to have rejected the lease does not apply to limit the liability of a third party guarantor of the rejected lease.
 

 In addition, in
 
 Mercantile Club, Inc. v. Scherr,
 
 102 Md.App. 757, 651 A.2d 456 (1995), this Court addressed the effect of the reorganization in bankruptcy of the principal debtor on the obligor under a contract that, we concluded, resembled a surety agreement more than a guaranty agreement. The president of the debtor company had executed a “guaranty” in which he guaranteed the performance of the company’s covenants and conditions under a mortgage—as opposed to guaranteeing the performance by the company of its obligations. We held that neither a contract of guarantee nor of suretyship
 
 *62
 
 can be eliminated by the reorganization of the principal company as a debtor in bankruptcy “because ‘[extinguishing or modifying the collateral obligation upon the reorganization of the principal debtor would defeat the very purpose of the
 
 guaranty—i.e.,
 
 protection against the principal’s inability to pay.’ ”
 
 Id.
 
 at 768-69, 651 A.2d 456 (quoting
 
 Allen v. Kaplan,
 
 255 Md. 409, 417, 258 A.2d 211 (1969)).
 
 See also
 
 section 524(c) (stating that, generally, discharge of a debt of the debtor does not affect the liability of any other entity in, or the property of any other entity for, such debt);
 
 Liberty Mut. v. Greenwich Ins.,
 
 286 F.Supp.2d 73 (D.Mass.2003) (observing that, while surety may plead defense of his principal, he may not raise personal defenses, including the defense of bankruptcy);
 
 Arrow Plumbing and Heating, Inc. v. North American Mechanical Services Corp.,
 
 810 F.Supp. 369, 372 (D.R.I.1993).
 

 Middlebrook first contends that the circuit court erred in granting summary judgment to Moore because it misapplied the doctrine of judicial estoppel. As explained above, the court ruled that, in the bankruptcy case, Middle-brook took the position that the Lease had terminated, automatically, under section 16(4) or 16(6), before the bankruptcy petition was filed in February 2002, and that Middlebrook therefore was judicially estopped to take a contrary position in pursuing its claim against Moore on the Guaranty. The court granted summary judgment to Moore on the implicit basis that Middlebrook was bound to the position that the Lease had terminated automatically, before the bankruptcy petition was filed, and that Optim’s status thereafter was simply as a holdover tenant. Because the Lease had terminated, Moore had no liability on his Guaranty to perform Optim’s obligations under the Lease, because there were no such obligations.
 

 The doctrine of judicial estoppel “precludes a party who ... secured a judgment in his or her favor from assuming a contrary position in another action simply because his or her interests have changed.”
 
 Mathews v. Underwood-Gary,
 
 133 Md.App. 570, 579, 758 A.2d 1019 (2000),
 
 aff'd on other grounds,
 
 366 Md. 660, 785 A.2d 708 (2001) (quotation
 
 *63
 
 marks and citation omitted). Three factors “typically inform the decision whether to apply” the doctrine of judicial estoppel in a particular case: whether the party’s later position is clearly inconsistent with its earlier position; whether the party succeeded in persuading the court in the earlier matter to accept its position, so that judicial acceptance of the contrary position in the later matter would create the perception that one of the courts had been misled; and whether the party seeking to assert the inconsistent position in the later matter would derive an unfair advantage, or would impose an unfair detriment on the other party, from being permitted to do so.
 
 Gordon v. Posner,
 
 142 Md.App. 399, 426-27, 790 A.2d 675 (2002).
 

 We agree with Middlebrook that the circuit court’s ruling on judicial estoppel in this case was wrong, for two reasons.
 

 First, there was nothing before the court to show that, in the bankruptcy case, Middlebrook advocated the position that the Lease had terminated automatically, under one of the triggers in section 16. The selection of filings from the bankruptcy case submitted to the circuit court in support of and opposition to the summary judgment motions contained nothing to suggest that Middlebrook took that position in the bankruptcy case. Indeed, it seems clear that Middlebrook did
 
 not
 
 advocate that position in the bankruptcy case, and neither did any party or other claimant.
 

 As explained above, in its motion for relief from automatic stay, Middlebrook posed two, alternative arguments: that the Lease was not renewed, and therefore the Lease term expired on April 30, 2002, and Optim was occupying the premises as a holdover tenant under section 16 of the Lease; or that the Lease was renewed, and Optim was occupying the premises under the Lease for the Renewal Term (May 1, 2002, to April 30, 2007). These arguments were entirely different from, and inconsistent with, an argument that the Lease had automatically terminated under section 16, on December 9, 1999, or on August 30, 2001 (or at any time for that matter). The evidence before circuit court did not and could not establish
 
 *64
 
 that Middlebrook had taken the position in the bankruptcy case that the Lease had terminated automatically under section 16.
 

 In addition, as our discussion above makes plain, for the doctrine of judicial estoppel to apply, the position advocated by the party in the earlier matter must have been accepted by the court in that matter.
 
 See Gordon, supra,
 
 142 Md.App. at 426-27, 790 A.2d 675. Here, the Bankruptcy Court did not address the issue whether the Lease was terminated prepetition, let alone accept that position. From the materials we have reviewed, that is, all of the bankruptcy filings furnished to the circuit court and made a part of the record in this case (which we recognize constitute but a small selection of the Bankruptcy Court filings), it seems that
 
 no one
 
 raised before the Bankruptcy Court the question whether the Lease had terminated, automatically, pre-petition; the court did not explore the question, because it was not raised; and the court’s June 7, 2002 order, finding that the Trustee was deemed to have rejected the Lease under section 365(d)(4), implicitly was at odds with a finding that the Lease had terminated before the bankruptcy petition was filed. As noted, section 365 applies only to unexpired leases. If the Lease had terminated before the bankruptcy petition was filed, it was an expired Lease that could not have been assumed by the Trustee, and therefore would not have been deemed rejected by the Bankruptcy Court.
 

 In oral argument in this Court, Moore’s counsel acknowledged that the evidence before the circuit court did not support its judicial estoppel ruling, but argued that the court misspoke, and in fact was ruling that Middlebrook was es-topped to take a position other than that the Lease had not been
 
 renewed,.
 
 The circuit court judge’s words belie that contention, however, as they specifically refer to “termination,” section 16, the Lease’s being terminated “by operation of law,” and “triggering events,” all of which concerned the issue of automatic termination under section 16 of the Lease and not the issue of non-renewal of the Lease, under the Amendment.
 

 
 *65
 
 For these reasons, the circuit court was legally incorrect in ruling that Middlebrook was precluded, under the doctrine of judicial estoppel, from advocating in its breach of guaranty case against Moore a position other than that the Lease automatically had terminated, before the bankruptcy petition was filed, by a triggering event under section 16.
 

 Middlebrook next contends that the circuit court itself ruled, apart from its judicial estoppel decision, that on the undisputed evidence the Lease terminated automatically, under section 16. As explained above, we evaluate a circuit court’s decision to grant a motion for summary judgment on the grounds on which the decision was made, and if the grounds are not specified, on those advanced. It is clear that the decision in this case hinged primarily on judicial estoppel. In the course of ruling on that topic, however, the court remarked, “It seems to me that by operation of the lease, that the lease itself was terminated.” This appears to be a ruling that, on the evidence submitted to the court in support of and opposition to the motions for summary judgment, the Lease terminated, automatically, before the bankruptcy petition was filed, under either section 16(4) or section 16(6); and further that, on that basis, Middlebrook’s claim on Moore’s Guaranty must fail. Accordingly, we shall address the question whether the court’s decision in that regard was legally correct. For the following reasons, we conclude that, on the undisputed material facts, as a matter of law, the Lease did not terminate automatically under section 16, before the bankruptcy petition was filed.
 

 Leases are contracts and, as such, are to be construed by application of the well established rules of contract interpretation.
 
 Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC,
 
 876 Md. 157, 829 A.2d 540 (2003) (applying rules of contract interpretation to lease);
 
 see also B & P Enterprises v. Overland Equipment Co.,
 
 133 Md.App. 583, 604, 758 A.2d 1026 (2000) (citing
 
 Cloverland Farms Dairy, Inc. v. Fry,
 
 322 Md. 367, 373, 587 A.2d 527 (1991)) (applying rules of contract interpretation to lease).
 

 
 *66
 
 When determining the meaning of contractual language, Maryland courts employ the objective theory of contract interpretation.
 
 Sy-Lene, supra,
 
 376 Md. at 166, 829 A.2d 540. The principal goal in the interpretation of contracts is to effectuate the intention of the parties.
 
 Sy-Lene, supra,
 
 376 Md. at 166, 829 A.2d 540;
 
 Kasten Constr. Co., Inc. v. Rod Enterprises, Inc.,
 
 268 Md. 318, 328, 301 A.2d 12 (1973);
 
 College of Notre Dame of Maryland, Inc. v. Morabito Consultants, Inc.
 
 132 Md.App. 158, 168, 752 A.2d 265 (2000);
 
 McIntyre v. Guild, Inc.,
 
 105 Md.App. 332, 355, 659 A.2d 398 (1995). When a contract’s language is expressed in clear and unambiguous terms, the court will not engage in construction, but will look solely to what was written as conclusive of the parties’ intent.
 
 Adloo v. H.T. Brown Real Estate, Inc.,
 
 344 Md. 254, 266, 686 A.2d 298 (1996);
 
 College of Notre Dame of Maryland, supra,
 
 132 Md.App. at 168, 752 A.2d 265.
 

 Contract interpretation involves discerning the terms of the contract itself.
 
 Fister v. Allstate Life Ins. Co.,
 
 366 Md. 201, 210, 783 A.2d 194 (2001). The terms of the contract must be interpreted in context and be given their ordinary and usual meaning.
 
 Langston v. Langston,
 
 366 Md. 490, 506, 784 A.2d 1086 (2001);
 
 Lloyd E. Mitchell, Inc. v. Maryland Cas. Co.,
 
 324 Md. 44, 56-57, 595 A.2d 469 (1991). The court’s interpretation should not permit an absurd or unreasonable result.
 
 Springhill Lake Investors Ltd. Partnership v. Prince George’s County,
 
 114 Md.App. 420, 434, 690 A.2d 535 (1997);
 
 see also Board of Incorporators of A.M.E. Church, Inc. v. Mt. Olive A.M.E. Church of Fruitland, Inc.,
 
 108 Md.App. 551, 579-580, 672 A.2d 679 (1996) (citing
 
 Born v. Hammond,
 
 218 Md. 184, 188, 146 A.2d 44 (1958) (noting that when a contract is susceptible of two constructions, one of which produces an absurd result and the other of which carries out the purpose of the agreement, the latter construction should prevail)),
 
 rev’d on other grounds by Mt. Olive A.M.E. Church of Fruitland, Inc. v. Board of Incorporators of AM.E. Church, Inc.,
 
 348 Md. 299, 703 A.2d 194 (1997).
 

 
 *67
 
 Although he does not put it in these terms, Moore’s argument respecting section 16, to the extent that section is not an invalid
 
 “ipso facto
 
 clause” under section 365 of the Bankruptcy Code with respect to post-petition events, is that it imposed conditional limitations on the leasehold estate. A conditional limitation fixes the leasehold estate so that, upon the happening of a specified event, the leasehold estate terminates by operation of law. 2 Powell on Real Property § 17.02(l)(a) (Michael A. Wolf ed., Matthew Bender & Co.2003); 5 Thompson on Real Property § 40.08(b)(1) (David A Thomas ed., Michie Co.2003); 49 Am.Jur.2d
 
 Landlord and Tenant
 
 § 217 (2003).
 
 See also Gouveneur Gardens Housing Corp. v. Lee,
 
 2 Misc.3d 525, 769 N.Y.S.2d 829, 831 (2003). It stands in contrast to a condition subsequent in a lease, by which, upon the happening of a specified event, a party, usually the landlord, becomes entitled to terminate the lease.
 
 Gouveneur Gardens, supra,
 
 769 N.Y.S.2d at 831. Moore maintains that section 16 set forth a number of specific events that conditionally limited the leasehold, so that, upon the happening of any of them, the Lease terminated by operation of law, even if Middlebrook did not know that a triggering event had happened.
 

 We must interpret section 16 by reading its plain language, including its express statement of purpose, that is, “it being of prime importance to the Landlord to deal only with Tenants who have, and continue to have, a strong degree of financial strength and financial stability.” The clearly stated objective of the section is to benefit the landlord—Middlebrook—by protecting its interest in dealing with a tenant that is financially viable. To that end, each of the so-called triggering events, in which termination is said to occur without any action or the giving of notice on the part of Middlebrook, concerns the financial circumstances or well-being of Optim.
 

 When a limitation on a leasehold estate is for the benefit of one party and that party alone, it cannot be taken advantage of by the other party; therefore, it also cannot be reasonably read as being self-executing.
 
 See Markey v.
 
 
 *68
 

 Smith,
 
 301 Mass. 64, 68, 16 N.E.2d 20 (1938) (stating that “[e]ven where there are apt words in an instrument to create a [conditional] limitation, and sufficient for that purpose if they stood alone, yet an examination of all parts of the instrument may lead to the conclusion that a condition subsequent is its obvious purpose”). Otherwise, the party who is not meant to benefit from the provision can take improper advantage under it. 49 Am. Jur.2d
 
 Landlord and Tenant
 
 § 217 (explaining that “where the provision is for the cessation of the lease in the event of some contingency dependent on the conduct of the lessee, the courts will construe it not as a [conditional] limitation on the term, but as a condition subsequent, vesting in the lessor a waivable option to terminate the lease”). While the happening of the triggering event may operate to limit the leasehold estate, it only does so if the party for whose benefit the limitation exists knows of the event and signifies an intention to limit the estate; it does not operate to end the estate automatically, without any knowledge or expression of intention by the party whose benefit it is meant to serve.
 

 This concept was explained long ago in
 
 Cohen v. Afro-American Realty Co.,
 
 58 Misc. 199, 108 N.Y.S. 998 (1908), in which a lease provided that, upon the filing of any legal process against the tenant, the lease would immediately cease and come to an end. The tenant attempted to invoke the provision, arguing that, because he had been served with process, the lease automatically terminated, by operation of law, and he no longer had an obligation to pay rent. The court rejected the effort, holding that, because the conditional limitation on the estate was wholly for the benefit of the landlord, the tenant could not take advantage of it unless the landlord signified his intention to avail himself of the conditional limitation. Any other interpretation would give way to the completely unreasonable result that the tenant, who was not the intended beneficiary of the termination clause, could unilaterally bring the lease to an end, merely to avoid his obligations under it, to the detriment of the landlord, for whose benefit the termination clause existed.
 
 See also Nelson v. Seidel,
 
 328 S.W.2d 805, 807 (Tex.App.1959) (holding that a
 
 *69
 
 lease provision that terminated all rights granted to the lessee upon any attempt to assign the lease to be a condition subsequent because it was for the sole benefit of the lessor and not the lessee, and interpreted otherwise, would allow the lessee to avoid the obligations under the lease by defaulting on the terms of that provision);
 
 Wills v. Manufacturers’ Nat. Gas Co.,
 
 130 Pa. 222, 230, 18 A. 721 (1889) (stating that even when a lease provision inserted wholly for the lessor’s benefit directs that it will become void on breach of a condition, “it will only be void at the option of the lessor; for the lessee shall not take advantage of his own wrongful non-performance of his contract in order to destroy the lease, which had perhaps turned out to be a disadvantageous one” (internal quotations and citations omitted)).
 

 Even assuming, merely for the sake of argument, that either the December 9, 1999 Security Agreement or the later appointment of the Joint Administrative Receivers constituted triggering events under section 16(4) and (6), respectively, section 16 cannot reasonably be read,
 
 in toto,
 
 to mean that termination of the Lease was self-executing, in all circumstances, including when Middlebrook had no knowledge of the triggering events. Indeed, it may not have been to Middle-brook’s advantage to have the Lease terminate, and it may have been to Optim’s unfair advantage to avoid its obligations under the Lease by invoking a termination clause that was not meant to benefit it.
 
 [5]
 
 Such an interpretation would produce
 
 *70
 
 the absurd result that when Optim signed the Security Agreement, in order to extend collateral for the loan from the BOS to Trident, it succeeded in bringing the Lease to an end, thus ending its obligations and Moore’s collateral obligation, given two days earlier in the Guaranty, without Middlebrook’s knowledge and without vacating the Leased Premises, and regardless of whether it was in Middlebrook’s interest to have the Lease terminate. If the appointment of the Joint Administrative Receivers were the triggering event, the results would be equally absurd.
 

 As noted above, it is a fundamental tenet of contract interpretation that a court will not read contract language to produce an absurd result. The interpretation of section 16 Moore would have us adopt is especially preposterous given the context in which it is offered. The evidence submitted on summary judgment was undisputed that, until the bankruptcy petition was filed, in February 2002, Middlebrook’s and Optim’s relationship was as lessor and lessee under the Lease: Optim occupied the Leased Premises and paid rent as called for under the Lease, and Middlebrook made the Leased Premises available to Optim for occupancy. There was no evidence whatsoever to support an inference that either Middlebrook’s or Optim’s representatives, including Moore as president of Optim, thought that the Lease had terminated and that it no longer governed their relationship, or that they operated upon such an assumption.
 

 There also was no evidence that Middlebrook’s representatives had any knowledge of the events concerning Optim’s parent company, and eventually concerning Optim itself, that Moore points to as triggers to termination of the Lease. As
 
 *71
 
 noted above, there was no evidence that either Middlebrook or Optim, at any time, including during the bankruptcy case, took the position that the Lease had expired by operation of law under section 16. Only Moore, whose Guaranty covered the performance of Optim’s obligations under the Lease, and who therefore was no more the intended beneficiary of section 16 than was Optim, sought to invoke section 16, and only in an effort to gain advantage by avoiding the promises he made in the Guaranty, by in effect saying “Gotcha—there was no Lease to guaranty!” We will not interpret section 16 of the Lease so as to produce such an obviously unfair, nonsensical, and unintended result.
 

 Section 16 cannot sensibly be read to be fully self-executing, because it was entirely for Middlebrook’s benefit. For the Lease to have terminated under section 16, there must have been some knowledge by Middlebrook of the happening of an event covered by section 16. and some indication on its part that it intended to reap the benefits of section 16 by ending the Lease. No such evidence was produced for the circuit court on summary judgment and, according to the parties, no such evidence exists. Accordingly, as a matter of law, the Lease did not automatically terminate upon the happening of the events Moore points to, prior to the filing of the bankruptcy petition.
 

 One of the primary battles between Middlebrook and Moore in this case is over whether the Lease term was renewed for the Renewal Term (May 1, 2002 to April 30, 2007) by virtue of Moore’s April 20, 2001 Renewal Letter, or whether the term was not effectively renewed, and therefore the Lease continued as a month-to-month tenancy under section 26. The circuit court did not decide this issue on summary judgment, and by the nature of its ruling, confined its decision to an issue (pre-petition termination of the Lease) that made deciding the renewal issue unnecessary. Because the issue was not decided below, and because it may not be proper for decision on the somewhat undeveloped record, we shall not address it.
 

 
 *72
 
 We make the following observation, however, so the parties and the court will not devote needless time to an issue that, as we see it, has no merit: that Middlebrook advocated in the Bankruptcy Court that the Lease was not renewed and that the Bankruptcy Court accepted that position, implicitly, in its June 7, 2002 order, so that Middlebrook is judicially estopped to take a contrary position.
 

 As explained above, in its motion for relief from the automatic stay, Middlebrook posed two alternative arguments: that the Lease term
 
 was not
 
 effectively renewed, and therefore Optim was occupying the Leased Premises as a holdover tenant, under section 26, or that the Lease
 
 was
 
 renewed, and therefore Optim was occupying the Leased Premises as a tenant for a term of years, under section one of the Addendum of the Lease. In either situation, Middlebrook sought relief from the Bankruptcy Court to regain possession of the premises from Optim. That court did not need to address which situation prevailed, however, because, by the time of its ruling, the Trustee’s failure to assume the Lease meant the Lease was deemed rejected under section 365(d)(4) of the bankruptcy code. Accordingly, a ruling on the issue cannot be implied in the Bankruptcy Court’s order. In short, non-renewal was one of two arguments presented to the Bankruptcy Court by Middlebrook—not a single position advocated by it—and the court seems not to have addressed it in any event. The doctrine of judicial estoppel does not apply to the issue of renewal or non-renewal of the Lease.
 

 The other issues raised by Moore in his cross-motion for summary judgment also were not the basis for the circuit court’s ruling and are not issues on which the court lacked discretion to make any decision other than to grant summary judgment. Accordingly, we shall not address them.
 

 JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.
 

 [1]
 

 . The questions presented by Middlebrook in its brief are:
 

 1. Whether the Circuit Court erred in granting Summary Judgment in favor of [Moore] when it applied the doctrine of judicial estoppel to bar [Middlebrook's] claim for relief against [Moore] under an absolute and unconditional guaranty of a Lease, notwithstanding the fact that the Bankruptcy Court, in an earlier proceeding, did not adjudicate the issue that formed the basis of the claim of judicial estoppelf.]
 

 2. Whether the Circuit Court erred by granting Summary Judgment in favor of [Moore] and dismissing [Middlebrook's] claim for relief
 
 *46
 
 under an absolute and unconditional guaranty of a Lease, based on the filing of an involuntary bankruptcy by tenant’s former employees. 3. Whether the Circuit Court erred by granting Summary Judgment in favor of [Moore] when it addressed the implications of the Bankruptcy Provision in the Lease and held that despite the tenant's default under the Lease for failing to pay rent, the Bankruptcy Provision in the Lease precluded the relief sought by [Middlebrook] against [Moore] under an absolute and unconditional guaranty, as a result of a foreign insolvency proceeding involving the tenant’s parent company and/or the involuntary bankruptcy filed under the U.S. Bankruptcy Code by tenant’s former employees.
 

 [2]
 

 . Moore also argued that the Lease, if not already terminated, was terminated when Woolf was appointed Trustee of Optim’s assets in the bankruptcy case. He later withdrew that argument, in recognition that section 365(e)(1) of the Bankruptcy Code prohibits what are known as
 
 “ipso facto
 
 clauses,” that is, clauses that declare an executory contract or unexpired lease of the debtor terminated in the event of the debtor’s bankruptcy, or that there has been a material breach. Section 365(3)(1) invalidates clauses conditioned, at any time after commencement of the bankruptcy case, on
 

 (A) the insolvency or financial condition of the debtor at any time before the closing of the [bankruptcy] case; (B) the commencement of [the bankruptcy case]; or (C) the appointment of or taking possession by a trustee in a case under [the Bankruptcy Code] or a custodian before such commencement.
 

 [3]
 

 . The following documents were before the circuit court on the day of the hearing, having been attached to the complaint, answer, motion,
 
 *55
 
 and cross-motion for summary judgment filed by the parties: Lease Agreement between Brooke Venture Ltd. Partnership and Optim Electronics Corporation; Addendum to the Lease Agreement; Amendment to the Lease Agreement; Guaranty of the Lease Agreement by Roger Moore; April 20, 2001 letter by Roger Moore to Middlebrook Tech, LLC exercising Optim's right to extend the Lease; an affidavit by Middle-brook Tech, LLC; Notice by Administrative Receiver Suspending Moore’s Power as a Director of Optim; Tenant’s Ledger showing charges to and payments by Optim to Middlebrook; Trustee's Motion for Approval of Settlement in the Maryland bankruptcy case with Security Agreement and UCC-1 attached; Report of the Joint Administrative Receivers; Affidavit by Jeffery Orenstein; the Bank of Scotland's Response to Order Requiring Bank of Scotland to File Augmented Schedules and Financial Schedules and Financial Affairs; March 18, 2002 Order by Bankruptcy Court Entering Relief Under Chapter 7 on Involuntary Petition and Directing Compliance with Filing Requirements; Motion by Roger Moore to Amend Order Directing Designated Creditors to File Chapter 7 Schedules A-J, Statement of Financial Affairs, and Mailing Matrix. Also, at the hearing, Middlebrook’s motion for relief from automatic stay, and the Bankruptcy Court’s June 7, 2002 order granting that relief, were moved into the record.
 

 [4]
 

 . Counsel’s arguments were somewhat inconsistent. She asserted that the Lease itself—not the Lease term—terminated under section 16, but then suggested that the Lease had to be renewed at the end of its term— by April 30, 2002—to be continued; and that the renewal was not effective. If only the Lease term expired, however, the Lease still would remain effective, under section 26.
 

 [5]
 

 . The facts before the circuit court showed that the Security Agreement was a pledge of assets as collateral, by which there was no change in title, not an assignment of assets, in which title is transferred.
 
 See
 
 Black’s Law Dictionary 115 (7th ed.1999) (defining an "assignment” as the act of transferring to another all or part of one’s property, interest or rights);
 
 id.
 
 at 1175 (defining "pledge” as a bailment, pawn, or deposit of personal property to a creditor as security for some debt or engagement);
 
 compare Roberts v. Total Health Care, Inc.,
 
 349 Md. 499, 511, 709 A.2d 142 (1998) (stating that the effect of an assignment is transfer of all interest in the property),
 
 with Automobile Acceptance Corp. v. Universal C.I.T. Credit Corp.,
 
 216 Md. 344, 355, 139 A.2d 683 (1958) (stating that a pledge is intended to furnish security in case of default of a debtor). Accordingly, section 16(4) appears not to have applied in any event. Also, the evidence before the circuit court did not
 
 *70
 
 show how the Joint Administrative Receivers were appointed. For section 16(6) to apply, if British law applies at all to section 16—an issue of ambiguity in the language of that section that was an undeveloped factual dispute that alone made the grant of summary judgment based on that section improper—a receiver would have to be appointed by court order. There was no evidence before the court of an order appointing the receivers, and the evidence suggested the receivers may have been appointed by the BOS, acting on its own authority based on the loan documents.